**David JEFFERSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 92–CF–309.

District of Columbia Court of Appeals.

Argued April 13, 1993.
Decided Aug. 26, 1993.

Philip A. Sechler, Washington, DC, appointed by the court, for appellant.

Peter H. White, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Renee Y. Webb, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and KING, Associate Judges.

TERRY, Associate Judge:

Appellant Jefferson was convicted of distributing cocaine.[1] He raised an entrapment defense, asserting that the police "coerced him to do this act." On appeal he contends that the government used its peremptory challenges in a discriminatory manner, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and that the evidence was insufficient to permit the jury to find that he was predisposed to distribute drugs. Although we agree that the procedure employed by the trial court in considering the *Batson* claim was not what it should have been, we conclude that appellant failed to make a prima facie showing of a *Batson* violation. His challenge to the sufficiency of the evidence is wholly without merit. Accordingly, we affirm the conviction.

---

1. D.C.Code § 33–541(a)(1) (1988).

# I

## A. *Jury Selection*

During the *voir dire,* after several venire members were excused for cause, counsel began to exercise their peremptory challenges. When defense counsel raised an objection to the government's use of its peremptory strikes, the following discussion occurred at the bench:

[DEFENSE COUNSEL]: Your Honor, I want to object to the Government's strike. Every strike has been someone of the same race as Mr. Jefferson.

[PROSECUTOR]: That's not true.

[DEFENSE COUNSEL]: This gentleman [referring to a juror struck by the prosecutor] hasn't even spoken, to my recollection. It appears to be no pattern other than racial for the strikes.

\*     \*     \*     \*     \*     \*

... All the strikes except for the one gentleman that has experimented with drugs are of the same, are black people.

THE COURT: You think that she's discriminating against Mr.—

[DEFENSE COUNSEL]: That's what I was alleging, Your Honor, yes.

THE COURT: Well, I'm sure she wouldn't do that intentionally.

[DEFENSE COUNSEL]: Well, intentionally or otherwise, he's still the one that gets harmed by it.

[PROSECUTOR]: Your Honor, I would note for the record that all of my strikes have not been of the same race, and I would also note that all of counsel's strikes have been of the same race. And if that would be an issue, I would raise it as to counsel. He has struck all white jurors.

THE COURT: Counsel may continue their strikes.

The bench conference ended at this point, and the *voir dire* resumed.

After jury selection had been completed and the jury had left for lunch, the trial court returned to the issue:

THE COURT: All right. Now, what was the—you want to put on the record again the motion that you were trying to make in the court?

[DEFENSE COUNSEL]: Yes, sir. Thank you, Your Honor. Yes. All the strikes of the Government except one strike of Juror 661896 were strikes of people of the same race as Mr. Jefferson. I was unable to determine a pattern based on anything other than race for those strikes since most of those strikes were not people who commented during the voir dire process. And I was objecting to those strikes because [they] appeared to be based on race.

THE COURT: All right. What does the Government have to say?

[PROSECUTOR]: First, Your Honor, the Government would note that all of its strikes were not of race [*sic*]. I didn't keep a count of how many were black or how many were white or how many were of whatever race because, frankly, that wasn't the basis of my strikes. I did note, however, that counsel himself struck all white jurors.

[DEFENSE COUNSEL]: I'd like to correct the record.

THE COURT: Just a minute.

[PROSECUTOR]: After he raised his issue. But I would note that the fact that they didn't speak doesn't necessarily mean that you struck that person because of race. There's a number of things, the way that a person looked at you, the way that a person might have kept looking at the defendant, which was certainly a basis for some of my strikes. Smiling, appearing to be too friendly with the defendant, or looking too hard at me.

I think most lawyers know that when you're picking a jury, it's just very subtle things that are transmitted to the lawyers in the course of picking the jury, and I just would like to state for the record that race wasn't the basis of me striking these individuals.

THE COURT: Okay. Well, I don't have to resolve that issue right now anyway, but we've got a jury so that may resolve

everything. You may raise it again at a later date if you want to.

The issue was not discussed further.

### B. *The Trial*

Mario Etienne was a member of the Rapid Deployment Unit of the Metropolitan Police. He testified that on July 11, 1991, he was assigned to the 2500 block of Pomeroy Road, S.E., prepared to engage in an undercover purchase of narcotics. He walked up to some people playing basketball and asked if anyone was "working," *i.e.*, selling cocaine. One of the basketball players told him "to go up in the parking lot," but when Etienne asked someone in the parking lot whether anyone was working, "that man told [him] no." After leaving the parking lot, however, he saw appellant Jefferson and asked him "if he knew anyone that was working." Jefferson directed the officer back to the parking lot, but when Etienne said he would not go there,[2] Jefferson replied that he would go to the lot himself and "get one to come down here and serve you." Jefferson then approached another man, later identified as Barry Johnson, who, along with Jefferson, disappeared out of the officer's sight. Moments later the two returned, and Jefferson handed Officer Etienne a ziplock bag of cocaine. Etienne in exchange gave Jefferson a $20 bill whose serial number he had previously recorded, and Jefferson in turn handed the money to Johnson.

Officer Christopher Coles, who was working under cover with Officer Etienne and was standing about thirty feet away from him when he bought the cocaine, radioed a lookout to an arrest team waiting nearby. Acting on that broadcast, the arrest team stopped two men—Jefferson and Johnson—whom Etienne later identified as the two that were involved in the drug sale. Officer Reginald Adams, a member of the arrest team, searched Johnson and recovered $200 in cash, which included the pre-recorded $20 bill.[3]

The defense presented no evidence. In his closing argument, however, defense counsel said to the jury:

> [I]f you find some evidence that Mr. Jefferson was enticed, was induced to commit this crime, in other words, he didn't have it on his mind, and was induced by the police to do it, then, if you make that finding, you have to find beyond a reasonable doubt that he wasn't predisposed to commit this crime, except for what the police did.

The court included in its charge to the jury an instruction on entrapment, to which neither party objected.

### II

■ An assertion by counsel that the government is acting in a racially discriminatory manner is very serious and demands the closest possible scrutiny by both the trial court and this court. We agree that the trial court in this case should have examined defense counsel's claim much more carefully. On the present record, however, we conclude that counsel did not make a prima facie showing of a *Batson* violation.[4]

Relying on this court's decision in *Nelson v. United States*, 601 A.2d 582 (D.C.1991), the government asserts that defense counsel "did not make a record on which his *Batson* claim can be considered." In *Nelson* the appellant claimed "that the trial court erred in overruling his objection to the prosecutor's alleged misuse of his peremptory challenges by striking only black persons." *Id.* at 590. We rejected this argument for the "fundamental reason that the record on appeal fails to establish the racial makeup of either the venire or the jury actually selected, and that under *Cobb v. Standard Drug Co.*, 453 A.2d 110 (D.C.1982), the responsibility for that fail-

---

**2.** Officer Etienne testified on cross-examination that he told Jefferson that he would not go to the parking lot because some of the "young ones" there had taken his money in the past.

**3.** Johnson, also known as Anthony Conner, was indicted along with Jefferson, but his case was severed, and he was tried separately.

**4.** Jefferson is very ably represented on appeal by newly appointed counsel.

ure lies with appellant." *Nelson, supra,* 601 A.2d at 590. The same thing happened here: counsel for appellant Jefferson failed to establish the racial makeup of either the venire or the jury actually selected.

Jefferson mistakenly believes that he may rely solely on the fact that the prosecutor used nine of her ten peremptory strikes ·to remove black persons from the venire to support his *Batson* claim. He is asking us, in effect, to "extrapolate a pattern of discrimination"[5] from the number of black venire members who were challenged by the prosecutor as compared with the number of white venire members challenged. We agree with the Maryland Court of Special Appeals that such limited facts—the number of black persons challenged versus the number of white persons challenged—can be relevant only when the court also has "knowledge of the percentage of strikes used against a given group [and] also knowledge of the percentage that that group represented of the total venire panel—or, more precisely, of the percentage that that group represented of the prospective jurors actually called forward to be accepted or challenged." *Bailey v. State, supra* note 5, 84 Md.App. at 331, 579 A.2d at 778; *see United States v. Esparsen,* 930 F.2d 1461, 1467 (10th Cir. 1991) ("the number of challenges used against members of a particular race is 'not sufficient to establish or negate a prima facie case' " (citations omitted)), *cert. denied,* —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992).

Despite the trial court's prompting to develop a record on this issue, defense counsel said only the following:

> All the strikes of the Government except one strike of Juror 661896 were strikes of people of the same race as Mr. Jefferson. I was unable to determine a pattern based on anything other than race for those strikes since most of those strikes were not people who commented

during the voir dire process. And I was objecting to those strikes because it appeared to be based on race.

This was not enough. It is true that "the burden of establishing a prima facie showing is not onerous and that its primary function is to eliminate the most common nondiscriminatory reasons for the prosecutor's peremptory strikes." *Little v. United States,* 613 A.2d 880, 885 (D.C.1992) (citation omitted). But that burden is not met by counsel's mere assertion of a discriminatory purpose. The fact that nine of the prosecutor's ten challenges were directed toward black persons is not sufficient to establish such a purpose, even prima facie. As we observed in *Little,* "Given the composition of the typical venire in the District of Columbia, 'it is not particularly surprising [when] all of the persons struck by the prosecutor [are] black.' " 613 A.2d at 886 (quoting *Nelson, supra,* 601 A.2d at 590–591).

Jefferson maintains that he established a prima facie case when his counsel objected to the prosecutor's use of her fifth peremptory challenge "because it excluded a black male who had not answered a single question during *voir dire.*" At this point the prosecutor had exercised four of five challenges against black venire members. The trial court, however, dismissed counsel's assertion and told counsel to continue their strikes. After the jury was in the box, counsel again raised his objection to the prosecutor's use of peremptory challenges, asserting that nine of the government's ten challenges had been directed at black persons, "most" of whom had not said anything during *voir dire.*[6] The court, after listening to a brief response by the prosecutor, determined that the defense had not met its burden of making out a prima facie case.

In *Batson* the Supreme Court articulated the standards for assessing whether a prima facie case has been established:

---

**5.** *Bailey v. State,* 84 Md.App. 323, 331, 579 A.2d 774, 778, *cert. denied,* 321 Md. 225, 582 A.2d 531 (1990).

**6.** In most cases this fact alone is of little or no value in assessing a *Batson* claim. As the prose-

cutor observed, there are many reasons why a particular venire member may be struck, and such reasons are not necessarily revealed by what that person does or does not say during *voir dire.*

To establish such a case, the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." ... Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their race.

476 U.S. at 96, 106 S.Ct. at 1723 (citations omitted). The determination of whether a prima facie showing has been made is particularly fact-sensitive, *Little, supra,* 613 A.2d at 885, and the Supreme Court has made clear that trial judges, because they are "experienced in supervising *voir dire,*" are the ones who "will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Batson, supra,* 476 U.S. at 97, 106 S.Ct. at 1723.[7] This court, although noting that "[w]hether a defendant has satisfied the burden of making a prima facie case is a question of law," and thus an issue which we decide *de novo,* has also recognized that it "mι t give deference to both the trial court's findings of fact and its ultimate ruling on whether the defendant satisfied the prima facie burden." *Little, supra,* 613 A.2d at 885 (citing *Batson* ); *see United States v. Grandison,* 885 F.2d 143, 146 (4th Cir.1989), *cert. denied,*

495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990).[8] While it would have been better if the trial judge here had stated in so many words whether the prima facie burden was met, his conclusion to that effect can be inferred from his decision to proceed with the trial after hearing the prosecutor's response to defense counsel's *Batson* claim. On the record before us, we cannot say that such a conclusion amounted to an abuse of discretion.

This court in *Little* engaged in a thorough discussion of the "relevant circumstances" which a trial judge should consider in determining whether a prima facie case has been established. 613 A.2d at 885–887. It is true that "[a] single strike of a white juror can be a means to conceal (or attempt to conceal) a pattern of striking black jurors...." *Id.* at 886. Nevertheless, a defendant "is required to 'come forward with *facts,* not just numbers alone' in making a prima facie showing ... although the trial court may examine statistical disparities as one factor in assessing the prima facie case." *Id.* (emphasis in original; citations omitted). Moreover, an inference of discrimination will not likely arise from a mere showing that the prosecution used all of its peremptory challenges to exclude blacks. *Id.* (citing *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1521 (6th Cir.1988)). In *Little,* where the record with respect to the *Batson* claim was much more thoroughly developed than in the case at bar, this court held that defense counsel had failed to make a prima facie case. The facts (1) that the defendant was black and six of seven strikes were directed toward black persons, (2) that several black persons were struck who had answered no

---

**7.** The Supreme Court has held that the use of peremptory challenges "to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race" violates the excluded jurors' rights to equal protection of the laws, and that the defendant may challenge his or her conviction by raising the rights of these third parties (the jurors). *Powers v. Ohio,* 499 U.S. 400, ———— , 111 S.Ct. 1364, 1370–1371, 113 L.Ed.2d 411 (1991).

**8.** In *Grandison, supra,* the court explained that such deference is due because the trial judge's

findings "stem[ ] from first-hand knowledge and observation of the critical events." 885 F.2d at 146. In particular, the trial judge "has the opportunity to observe voir dire and the prosecution's exercise of its peremptory challenges," as well as "the experience 'to identify a prima facie case of purposeful discrimination.'" *Id.* (citing *Batson* ). The court also noted that a trial judge's finding of intentional discrimination is a finding of fact "which turns largely 'on evaluation oι credibility.'" *Id.* (citing *Batson* ).

*voir dire* questions at all, and (3) that the only white person whom the prosecutor struck had answered a question did not persuade us that the defendant had made a prima facie showing of a *Batson* violation.[9] In the case at bar, the record is by no means as strong as the record in *Little*, and we see no reason to reach a different result.[10]

We think it would be imprudent for us to formulate a *per se* rule for determining whether a prima facie case is established. As we recognized in *Little*, there are various methods of concealing a pattern of striking black jurors. 613 A.2d at 886. A bright-line rule would be easy to circumvent and would give rise to numerous allegations and suspicions that a prosecutor was attempting to conceal discriminatory challenges. Instead we elect to defer, as the Supreme Court advised in *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723 to the assessment of the trial judge. *See United States v. Grandison, supra,* 885 F.2d at 146–147. We note, however, that the "favored method" of addressing a *Batson* claim is for the trial court to rule at each step of the *Batson* analysis; its failure to do so "deprives this court of the benefit of its factual determinations and the reasons supporting its ultimate holding." *United States v. Joe,* 928 F.2d 99, 103 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 71, 116 L.Ed.2d 45 (1991). We close this portion of our opinion by reiterating what we said in *Little:*

> [W]e caution trial judges to make a clear record of their reasons for finding or not finding that a defendant has made a prima facie case. The trial court should refer on the record to underlying facts or note the absence of facts either support-

ing or negating a prima facie case.... Where the issue is close, conservation of judicial resources might well justify inquiry of the government attorney as to the reasons for making a strike ... especially since the prosecutor's burden in rebutting a prima facie case is neither onerous nor time-consuming.

613 A.2d at 887–888 (citations and internal quotation marks omitted).

## III

Jefferson asserts that "there was insufficient evidence for the jury to find that [he] was predisposed to distribute cocaine prior to being approached by undercover officers." As Jefferson correctly notes, the Supreme Court, in its most recent case discussing the entrapment defense, has held that when "the defense of entrapment is at issue ... the prosecution must prove beyond [a] reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992) (citation omitted). It does not follow, however, that *Jacobson* supports his argument.

The entrapment defense "centers on ... a person's predisposition to commit a crime, and not on the government's conduct." *United States v. Whoie,* 288 U.S.App.D.C. 261, 263, 925 F.2d 1481, 1483 (1991). Once it is shown that the government "induced" the defendant to engage in criminal activity, it is the government's burden to prove that the defendant was otherwise predisposed to commit the crime. *Jacobson, supra,* —— U.S. at ——, 112 S.Ct. at 1540. Jefferson asserts that the government failed as a matter of law "to adduce evi-

---

**9.** We recognized in *Little* that the case was "a close one." 613 A.2d at 885. Had the defendant not relied solely on numbers, but brought forth additional facts, the decision might have been different. *See id.* at 887.

**10.** The government all but concedes that if the defense had presented a prima facie case, the prosecutor's general disclaimer about her use of peremptory challenges would almost certainly have been insufficient to meet the government's burden. *See Batson, supra,* 476 U.S. at 98, 106

S.Ct. at 1724 (prosecutor "must articulate a neutral explanation related to the particular case to be tried"); *United States v. Horsley,* 864 F.2d 1543, 1546 (11th Cir.1989) (prosecutor's "vague explanation" for striking a black juror, *i.e.,* "I don't have any particular reason; I just got a feeling about him,'" was insufficient to rebut defendant's prima facie showing of discrimination). The prosecutor's tit-for-tat comment here that defense counsel had "struck all white jurors" was particularly irrelevant.

dence to support the jury verdict that [he] was predisposed, independent of the Government's acts and beyond a reasonable doubt, to violate the law...." *Id.* —— U.S. at ——, 112 S.Ct. at 1543. In considering this argument, we view the evidence, as we must, in the light most favorable to the government. *E.g., Nelson v. United States, supra,* 601 A.2d at 593 (citing cases). Reversal is warranted "only where there is no evidence upon which a reasonable mind could infer guilt," *Patterson v. United States,* 479 A.2d 335, 338 (D.C. 1984) (citation omitted), which in this case means that reversal is warranted only if there is no evidence that Jefferson was predisposed.

The Supreme Court in *Jacobson* anticipated the very scenario presented in the instant case:

> [A]n agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later. In such a typical case ... the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition.

—— U.S. at ——, 112 S.Ct. at 1541 (citation omitted). The evidence in this case shows that Jefferson did not hesitate to assist Officer Etienne in obtaining drugs, but readily seized the opportunity to do so. When Etienne encountered Jefferson near the parking lot and asked him "if he knew anyone that was working," *i.e.,* selling drugs, Jefferson immediately responded by referring Etienne to the group of men in the parking lot. When Etienne declined to approach them, Jefferson offered to "get one [of them] to come down here and serve you." True to his word, he promptly went to the parking lot and brought back Barry Johnson, who together with Jefferson completed the sale. In the language of the Supreme Court in *Jacobson,* such "ready commission of the criminal act amply demonstrates the defendant's predisposition." *Id.*

We said many years ago in rejecting a similar claim of entrapment:

> [O]nly where creative governmental activity instills the criminal notion in an otherwise innocent individual may the entrapment defense properly lie. A defendant claiming entrapment must be more than unaware of the fact that the subject activity will lead to his arrest; *he must be wholly without criminal intent when he joins the police in the commission of a crime.*

*Williams v. United States,* 342 A.2d 367, 369 (D.C.1975) (emphasis added); *see United States v. Russell,* 411 U.S. 423, 435–436, 93 S.Ct. 1637, 1644–45, 36 L.Ed.2d 366 (1973). On the evidence here it is questionable whether the trial court should even have given an entrapment instruction at all. *See Mathews v. United States,* 485 U.S. 58, 66, 108 S.Ct. 883, 888, 99 L.Ed.2d 54 (1988) ("evidence that Government agents merely afforded an opportunity or facilities for the commission of the crime [is] insufficient to warrant such an instruction"); *Minor v. United States,* 623 A.2d 1182, 1187–1188 (D.C.1993). If this was error, however, it benefited the defense, and Jefferson cannot now complain of it. We hold that there was ample evidence from which the jury could reasonably find that Jefferson was predisposed to participate in the sale of cocaine to Officer Etienne.

Jefferson's conviction is therefore

*Affirmed.*

ROGERS, Chief Judge, dissenting:

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court made clear that racially discriminatory peremptory strikes are prohibited for several reasons. *First,* a defendant has a right, under the Equal Protection Clause of the Fourteenth Amendment, to be tried by a jury selected by non-discriminatory means from a venire which is fairly chosen. *Batson v. Kentucky, supra,* 476 U.S. at 85–87, 106 S.Ct. at 1717–18. *Second,* a discriminatory strike violates the equal protection rights of the individual juror who was unfairly struck, and implies that the juror was not competent to serve.

*Id.* at 87, 106 S.Ct. at 1718; *Little v. United States,* 613 A.2d 880, 884 (D.C.1992) (citing *Powers v. Ohio,* 499 U.S. 400, ——, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991)). The defendant has standing to raise an equal protection claim on behalf of the excluded juror. *Little, supra,* 613 A.2d at 884. *Third,* discriminatory strikes "undermine public confidence in the fairness of our system of justice." *Batson, supra,* 476 U.S. at 87, 106 S.Ct. at 1718.

To demonstrate a prima facie case of discrimination, the *Batson* Court instructed that:

> the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." ... Finally, the defendant must show that these facts and *any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the venire [members] from the petit jury on account of their race....
>
> [T]he trial court should consider all relevant circumstances. For example, a "pattern" of discrimination might give rise to an inference of discrimination. Similarly, the *prosecutor's* questions and *statements* during *voir dire* examination and in exercising [her or] his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

*Batson, supra,* 476 U.S. at 96–97, 106 S.Ct. at 1722–23 (citation omitted) (emphasis added).

Thus, the Supreme Court did not suggest, or imply, that a prima facie case could only be established by a statistical or mathematical showing. This court has likewise made clear that establishing a prima facie case "is not strictly a numbers game." *Little, supra,* 613 A.2d at 885. Rather, depending on the nature of the defendant's claim, the requirements for showing a prima facie case may vary. *See* Part I, *infra.*

In *Nelson v. United States,* 601 A.2d 582 (D.C.1991), which the majority concludes is essentially dispositive of the instant appeal, *see* majority opinion at 6, the defendant's sole claim was that "the government had used its peremptory challenges to strike only [B]lack persons" so that the jury was not representative of his peers. 601 A.2d at 590. The holding in *Nelson* means that a mere assertion that the government has struck only Black persons is alone not normally sufficient to establish a *Batson* claim, and if the defendant's only supporting contention is that the resulting jury was disproportionately composed, the defendant must show the composition of the venire or jury. *See id.* at 590. In other words, a defendant must provide the appellate court with a sufficient record to permit the court to evaluate his or her claim. *See id.* (citing *Cobb v. Standard Drug Co.,* 453 A.2d 110 (D.C.1982)). It was the *Nelson* defendant's emphasis and reliance on the final composition of the jury that made statistics about the jury's or venire's racial composition mandatory in that case.[1] *See id.*

By contrast, appellant does not rely solely on the fact that nine of the government's ten peremptory strikes were directed against Blacks. Instead, he refers to those numbers and also points to other indicia of discriminatory use of peremptory strikes, noting that most of the Blacks struck by

---

1. The recent decision in *Brown v. United States,* 627 A.2d 499 (D.C.1993), like *Nelson, supra,* concerned a defendant who challenged "the composition of the jury," thus making the racial composition of the jury or the venire an almost indispensable part of the record necessary for appellate review; apparently, the defendant in *Brown* failed to point to any circumstances that showed that the prosecutor had exercised peremptory challenges in a racially discriminatory way. *See Brown, supra,* 627 A.2d at 505. Like *Nelson, supra, Brown* means that when the only circumstance to which the defendant points as showing racial discrimination is the racial composition of the jury, the defendant must present the appellate court with a record that enables the appellate court to have sufficient information about the jury's or venire's racial composition to evaluate the defendant's claim.

the government answered no voir dire questions, that the only white venire member struck by the government did answer such a question, and that the prosecutor offered only vague reasons for her strikes and commented on the race of those struck by the government. Unlike the defendant in *Nelson*, appellant provided record evidence of these supporting circumstances. Moreover, the record is not as barren of information about the racial composition of the venire and jury as the majority opinion would tend to suggest. *See* Part II, *infra*. In addition, the defendant in *Nelson* made no claim that a juror's constitutional rights had been violated while appellant makes both a broad claim that the government used its peremptory strikes to remove Blacks from appellant's jury and a narrower claim that the government violated individual Black jurors' constitutional rights by striking them from the jury because they were Black. Consequently, *Nelson*'s insis-

tence on a numerical showing is not dispositive of this appeal.[2]

The trial judge did not make any findings or a ruling in response to the *Batson* challenge. *See Little, supra*, 613 A.2d at 887 (trial judges should make "clear record" of reasons for finding or not finding a prima facie case); *cf. Batson, supra*, 476 U.S. at 96–98, 106 S.Ct. at 1722–23; *United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir. 1987), *vacated in part on other grounds*, 836 F.2d 1312 (11th Cir.1988), *cert. dismissed*, 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988). The judge did not determine whether the defense had established a prima facie case that the prosecutor had exercised her peremptory challenges in a racially discriminatory manner, nor whether the prosecutor had provided race neutral explanations. Rather, despite timely *Batson* objections by defense counsel, the judge proceeded to trial without conducting further inquiry.[3] Hence, the

**2.** *Bailey v. State*, 84 Md.App. 323, 579 A.2d 774, 778 (1990), cited by the majority, *see* majority opinion at 16, is similar to *Nelson* and similarly fails to determine the result in the instant case. In *Bailey*, the defendant claimed that the trial judge was compelled to find a prima facie case "*solely* on the mathematical basis that seven out of ten of the prosecutor's peremptory challenges were directed at black prospective jurors." *Bailey, supra*, 579 A.2d at 777 (emphasis added). The Maryland court was aware of the racial composition of the defendant's jury. *Id.* at 775. The *Bailey* court further noted that "[t]here are, of course, other ways of demonstrating a *prima facie* case of the racially discriminatory use of peremptory challenges. We are concerned here, however, only with the probative impact of statistics *standing alone*." *Id.* at 778 (second emphasis added). *Cf. Eiland v. State*, 92 Md. App. 56, 607 A.2d 42, 57 (1992) (using "admittedly imprecise denominator" of gender composition of jury pool that remained after challenges for cause, even though no information available about gender of those "actually called to be accepted or challenged").

The majority's reliance on *Little, supra*, 613 A.2d 880, is also unpersuasive. *See* majority opinion at 17–18. In *Little*, the court deferred to the trial court's findings and emphasized the fact that the prosecutor gave up potential opportunities to discriminate by passing on peremptory challenges four times; even so, the court described *Little* as a "close" case. *Id.* at 887, 885. In the instant case, the trial judge did not make any findings or rule on whether appellant had presented a prima facie case, so no defer-

ence is due, and the prosecutor never passed over an opportunity to make a peremptory challenge, even though only one eligible venire member remained in the courtroom during the last round of strikes. Therefore, *Little* does not determine that appellant failed to present a prima facie showing in the instant case.

**3.** The majority concludes that the trial judge's ruling on whether appellant had presented a prima facie case "can be inferred from his decision to proceed with the trial after hearing the prosecutor's response to defense counsel's *Batson* claim." Majority opinion at 17. The majority presumably means that the trial judge implicitly found that appellant had *not* presented a prima facie case. However, the trial judge declined to make any ruling, explicitly stating that "I don't have to resolve that issue right now.... You may raise it at a later date if you want to." Indeed, it might even be argued that when the trial judge asked the prosecutor for an explanation, the judge implicitly made a finding that appellant had presented a prima facie case, in which case the judge erred in making no findings and in failing to rule on the ultimate issue of discrimination. *See Batson, supra*, 476 U.S. at 98, 106 S.Ct. at 1724 (after prosecutor gives reason, trial judge has "duty to determine if the defendant has established purposeful discrimination"); *Stanley v. State*, 313 Md. 50, 542 A.2d 1267, 1283 (1988) (when trial judge asked prosecutor for explanation, "[t]his was at least an implied finding of the existence of a prima facie case") (citing cases); *cf. Bailey, supra* 84 Md. App. at 330 note 2, 579 A.2d at 777 (quoting *Stanley, supra*, 542 A.2d at 1283). In any event,

judge abused his discretion. *See Johnson v. United States*, 398 A.2d 354, 363 (D.C. 1979) ("[f]ailure to exercise choice in a situation calling for choice is an abuse of discretion").

Upon a review of the record,[4] particularly in light of the prosecutor's facially suspect comments, the lack of a prima facie case is not so clear that this court can affirm in the absence of trial court findings. *See Batson, supra*, 476 U.S. at 96–97, 106 S.Ct. at 1723 ("[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances"; Court expressing "confidence that trial judges ... will be able to decide if the circumstances ... create[ ] a prima facie case"); *Bailey, supra* 84 Md.App. at 330 note 2, 579 A.2d at 776–77 (citing *Batson* and noting importance of trial court's "feel" of the case); *see also Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1277 & n. 11. The record does not permit the court to conclude that there was no basis on which the trial judge could have found that appellant had presented a prima facie case entitling him to the benefit of the rebuttable presumption under *Batson. See Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1278 (question is whether "legally mandatory rebuttable presumption was established"). Indeed, on this record, where the facts are undisputed, the court could find as a matter of law that appellant

had established a prima facie case. *See Little, supra*, 613 A.2d at 885 (a "close" case where six of the government's seven peremptory strikes were aimed at Black venire persons at Black defendant's trial, some of those Black venire persons answered no questions, and the only white venire person struck had answered a question; jury contained larger proportion of whites than the venire); *Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1277, 1278–79 (and cases cited); *see also* majority opinion at 18 n. 10. At least the court should remand the case to the trial judge for findings and a ruling; *cf. Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1279–80 (limited remand); *id.* 542 A.2d at 1285 (fact that judge "simply let the matter drop" weighs against limited remand). *See* Part III, *infra.*

### I.

The requirements for a prima facie case to raise a *Batson* claim are not intended to create an insurmountable barrier of exactitude. This is clear in both state and federal court decisions.[5] *E.g., Stanley, supra* note 3, 542 A.2d at 1271–73 (reviewing procedures required by *Batson* ). The federal circuit courts of appeals have not interpreted *Batson* to require that the defendant must show the relevant group's representation in the venire or jury. *Batson, supra*, 476 U.S. at 96, 106 S.Ct. at 1722–23; *id.* at 97, 106 S.Ct. at 1723 (prosecutor's com-

---

given the emphasis on trial court findings in response to *Batson* inquiries, *see Little, supra*, 613 A.2d at 885, inferred findings would appear to have no place.

**4.** *See Stanley, supra* 313 Md. at 57 note 3, 543 A.2d at 1277 (where undisputed relevant facts, court exercises its "independent constitutional judgment with respect to the conclusion to be drawn from them"); *cf. Little, supra*, 613 A.2d at 885 (defer to trial judge's findings and rulings but judge must "consider all relevant circumstances") (citation omitted); *Jones v. Ryan*, 987 F.2d 960, 965–66 (3d Cir.1993) (habeas corpus; *Batson* claim ordinarily mixed question of fact and law but trial court failed to make findings regarding prima facie case and prosecutor's explanation; plenary review).

**5.** Courts, in fact, state the requirements fairly generally. Indeed, most cases simply quote *Batson v. Kentucky, supra*, 476 U.S. at 96, 106 S.Ct.

at 1722–23 to describe the requirements of a prima facie case. *See Teague v. Lane*, 489 U.S. 288, 295, 109 S.Ct. 1060, 1067, 103 L.Ed.2d 334 (1989); *United States v. Moore*, 895 F.2d 484, 485–86 (8th Cir.1990); *United States v. Battle*, 836 F.2d 1084, 1085 (8th Cir.1987); *Mejia v. State*, 328 Md. 522, 616 A.2d 356, 361 (1992); *People v. Jenkins*, 75 N.Y.2d 550, 555 N.Y.S.2d 10, 12–13, 554 N.E.2d 47, 49–50 (1990); *see also United States v. Dawn*, 897 F.2d 1444, 1448 (8th Cir.1990) ("number of peremptory challenges the prosecutor exercises to exclude black members of the venire" is not enough for prima facie showing, trial court should consider all facts and circumstances, including a "pattern of striking blacks and the prosecutor's questions and statements during voir dire"), *cert. denied*, 498 U.S. 960, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990); *Stanley, supra* 313 Md. at note 3, 542 A.2d at 1277, 1278 (preponderance standard for initial prima facie showing, shifting burden of production to the state to respond to the rebuttable presumption of purposeful discrimination).

ments or pattern of strikes may support inference of discrimination, but "[t]hese examples are merely illustrative"). *See, e.g., Jones v. Ryan, supra* note 4, 987 F.2d 960 at 970–71 ("composition and 'random' manner of selecting venire panel are immaterial to a *Batson* inquiry"; five factors for trial court to employ in assessing whether a defendant has established a prima facie case); [6] *Moore, supra* note 5, 895 F.2d at 485 (prima facie case is "fact-intensive," requires facts, "not just numbers alone").[7]

Obviously, information about the relevant group's representation in the venire or jury is relevant and useful. *See, e.g., United States v. Sangineto–Miranda,* 859 F.2d 1501, 1520 (6th Cir.1988).[8] However, specific statistical information on the racial composition of the jury is not mandatory, partially because there are other ways to show discrimination.[9] *See Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972) (pre-*Batson,* discrimination in composition of grand jury, "mathematical standards" not set, "factual inquiry is necessary in each case"). The Eighth Circuit Court of Appeals has succinctly observed, in concluding that a prima facie case of discrimination had been established, that:

> [a]t oral argument, the Government requested that this court address the ne-

---

**6.** The Third Circuit Court of Appeals' five factors are: "How many members of the 'cognizable racial group' are in the venire panel; the nature of the crime; the race of the defendant and victim; a pattern of strikes against black [or other cognizable racial group] jurors in a particular venire; and a prosecutor's questions and statements during the selection process." *Jones, supra* note 4, 987 F.2d at 970–71 (citing *United States v. Clemons,* 843 F.2d 741, 748 (3d Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988)) (brackets by the Third Circuit Court).

**7.** *See also Clemons, supra* note 6, 843 F.2d at 748 (trial judge "should" consider the racial composition of the panel, the race of the defendant and victim, and the nature of the crime, but this "illustrative list" is not binding on trial judges); *id.* at 748 n. 5 ("the trial judge shall make determinations concerning the relevance of these statistical factors when appropriate"); *United States v. Alvarado,* 923 F.2d 253, 255, 256 (2d Cir.1991) ("*Batson*'s citation of *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), in connection with the assessment of a *prima facie* case, *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23 ... indicates that statistical disparities are to be examined"; but appellate court relied on general population statistics "as a surrogate" for statistics about the racial composition of the particular venire; "a challenge rate nearly twice the *likely* minority percentage of the venire strongly supports a *prima facie* case under *Batson*"); *cf. United States v. Esparsen,* 930 F.2d 1461, 1467 n. 5, 1468 (10th Cir. 1991) (disagreeing with *Alvarado*'s approach; "only the racial composition of the universe in which the prosecutor was operating is relevant"; but acknowledging that the court was "not establish[ing] at this time any rule on what amount of statistical disparity constitutes a prima facie case. *Nor do we intend to diminish the importance of non-numerical factors,* such as the demeanor of potential jurors, the prosecutor's behavior, or the voir dire answers of venire

members of different races") (emphasis added), *cert. denied,* —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *id.* at 1467 (statistics of race of jurors struck by prosecutor are not enough to establish prima facie case and "take[ ] on meaning only in the context of other information such as the racial composition of the venire, the race of others struck by the prosecution, or the voir dire answers of those who were struck compared to the answers of those who were not struck") (footnotes omitted).

**8.** The Sixth Circuit Court of Appeals stated:

> [I]t will be relevant to the third and crucial requirement of a prima facie case to know: (1) the racial composition of the initial group seated and the final jury panel sworn; (2) the number of peremptory strikes allowed each side; and (3) the race of those who were struck or excused from the jury panel throughout the *voir dire* (whether for cause or by a peremptory challenge), the order of strikes, and by whom they were exercised. In an appropriate case, it may also be useful to consider evidence as to the percentage of the "cognizable racial group" in the jury pool, or the racial composition of the district wherein the jury pool is selected.

*Id.* (footnote and citation omitted). The record in the *Sangineto–Miranda* case was a little unclear about the race of the venire members who were struck and which party conducted each strike, although the court was aware that at the defendant's second trial, "[t]he original panel of twelve potential jurors seated consisted of 7 blacks and 5 whites.... [and] the final jury panel contained at least 7 blacks." *Id.* at 1520–21. The court concluded, emphasizing its deference to the trial court's findings, that the defendant had not established a prima facie case of discrimination because his only contention was that all of the prosecution's strikes were aimed at Blacks. *Id.* at 1521.

**9.** *See supra* note 5.

cessity of determining the racial composition of a jury panel. We decline to do so.... [A] *Batson* inquiry focuses on whether or not racial discrimination exists in the striking of a [B]lack person from the jury, not on the fact that other [B]lacks may remain on the jury panel. *United States v. Johnson*, 873 F.2d 1137, 1139 n. 1, 1140 (8th Cir.1989), *cert. denied,* 498 U.S. 924, 111 S.Ct. 304, 112 L.Ed.2d 257 (1990).[10] Clearly, the presence of Blacks on a jury panel does not prevent a defendant from establishing a prima facie case of a *Batson* violation.[11]

In *Batson, supra,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18, the Supreme Court referred to Title VII disparate treatment cases as describing "prima facie burden of proof rules." Title VII cases indicate that the prima facie case requirement is not unduly burdensome. In the Title VII context, statistics may be useful to determine if the employer exhibits a general pattern of discrimination. *McDonnell Douglas*

Corp. v. Green, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973). Likewise, the racial composition of the employer's workforce would be "helpful," but it is not controlling. *Id.* at 805 n. 19, 93 S.Ct. at 1826.[12] Thus, in a Title VII disparate treatment case, the Court stated that:

> [t]he plaintiff must prove by a preponderance of the evidence that she ... was rejected under circumstances which give rise to an inference of unlawful discrimination. The prima facie case ... eliminates the most common nondiscriminatory reasons for the plaintiff's rejection ... [and] "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (cita-

---

**10.** The Florida Supreme Court concluded that a defendant had established a prima facie case merely by showing that four of the prosecutor's six peremptory strikes were aimed at Black venire members. *State v. Slappy,* 522 So.2d 18, 19, 23 (Fla.), *cert. denied,* 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988). The court did not state or consider the racial composition of the venire, and merely noted that "the final jury panel apparently contained one [B]lack," while stating that "number[s] alone [are] not dispositive, nor even the fact that a member of the minority in question has been seated as a juror." *Id.* at 24, 21 (citing federal cases). However, the court's standards were partly derived from its own case law, which in turn was based on the state constitution and provided more protection for defendants than the federal constitution. *Id.* at 20–21.

**11.** *See Johnson, supra,* 873 F.2d at 1139; *Jenkins, supra* note 5, 554 N.E.2d at 51 (discriminatory strikes violate rights of individual jurors, and "any consideration of the percentage of [B]lacks remaining on the petit jury compared to the percentage of [B]lacks in the community ... is irrelevant to an equal protection analysis under the Fourteenth Amendment"); *Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1278 (Md., presence of blacks on jury not determinative, record revealed number of blacks on venire); *see also Moore, supra* note 5, 895 F.2d at 486 n. 5 (same percent of Blacks in jury and venire, "exclusion of [B]lacks and not their inclusion ... is vital to a prima facie case of discrimination," but consider that prosecutor

could have struck more Blacks if had intent to discriminate); *Gordon, supra,* 817 F.2d at 1541 (dictum, discrimination against one potential juror is enough, even if others are seated); *Battle, supra* note 5, 836 F.2d at 1086 (same, dictum).

**12.** While *Batson* refers to Title VII disparate treatment cases, *Batson, supra,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18, disparate impact cases may understandably place more emphasis on statistical comparisons. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 650–55, 109 S.Ct. 2115, 2121–24, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 991–92, 108 S.Ct. 2777, 2785, 2787–88, 101 L.Ed.2d 827 (1988) (disparate impact cases often focus on statistical disparities and competing explanations for them; discriminatory motive not necessary but ultimate legal issue is same as in disparate treatment case); *Newark Branch N.A.A.C.P. v. Town of Harrison,* 940 F.2d 792, 798 (3d Cir.1991) (disparate impact cases often involve comparison of minority representation in relevant labor pool with minority representation in jobs at issue) (citing *Wards Cove Packing Co. v. Atonio, supra* ); *cf. Griggs v. Duke Power Co.,* 401 U.S. 424, 430 & n. 6, 91 S.Ct. 849, 853 & n. 6, 28 L.Ed.2d 158 (1971) (disparate impact). It is significant that the Supreme Court, in *Batson,* referred to disparate treatment rather than disparate impact Title VII cases in discussing the type of prima facie showing necessary for a *Batson* claim. *Batson, supra,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18.

tion omitted).[13] *See also St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2746–48, 125 L.Ed.2d 407 (1993); *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 713 n. 2, 103 S.Ct. 1478, 1481 n. 2, 75 L.Ed.2d 403 (1983) (no reversible error to find discrimination (not merely prima facie case); statistics cited were that only two of twelve employees promoted ahead of plaintiff had any post-high school education and none had college degrees). In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977), the Court explained that under *McDonnell Douglas Corp. v. Green, supra,* a plaintiff may establish an inference of discriminatory intent by merely showing that the most common non-discriminatory reasons for the hiring decision (e.g., absence of a vacancy and "absolute or relative lack of qualifications") do not apply.

Therefore, when courts apply a Title VII disparate treatment-type prima facie analysis to *Batson* claims, a criminal defendant may present a prima facie case of a *Batson* violation by showing that peremptory strikes against jurors belonging to a relevant group were not based on the most common legitimate reasons for striking jurors, such as bias or answers to voir dire questions. *See Little, supra,* 613 A.2d at 885 (main function of prima facie case requirement is to "eliminate the most common nondiscriminatory reasons for the prosecutor's peremptory strikes").

## II.

Appellant has raised claims of two types of discrimination described in *Batson, supra,* 476 U.S. at 85–87, 106 S.Ct. at 1716–18. He contends that the government impermissibly used its peremptory challenges to discriminate against individual Black persons in the venire and also to attempt to alter the racial balance of the jury that would hear his case by eliminating as many Blacks as possible from the jury panel. At trial, defense counsel objected to individual strikes of Black venire members by the prosecutor as well as to the pattern of strikes against Black venire members. On appeal, appellant maintains that he presented a prima facie case that the prosecutor used peremptory strikes to strike members of the venire solely because they were Black.

The prosecutor exercised all ten of her peremptory strikes, using them to remove one white and nine Black venire members. Six of the Black venire members struck by the prosecutor did not answer a single voir dire question. After the prosecutor indicated her intent to exercise her fifth peremptory strike, defense counsel raised an objection under *Batson.* The prosecutor's response was that not all of the jurors she struck were of the same race and that defense counsel was striking only white jurors. Defense counsel renewed his objection after the jury was chosen, stating that all but one of the government's peremptory strikes were aimed at Black voir dire members and most of those struck had not answered any voir dire questions. The trial judge asked, "[w]hat does the government have to say?" The prosecutor responded again that not all of her strikes had been aimed at venirepersons of the same race and that defense counsel had struck only white venire members. The trial judge then remarked that there was no need to "resolve that issue" at that time, and that defense counsel was free to raise the issue again.

---

**13.** A prima facie case for a Title VII claim of racial discrimination has also been described as requiring a plaintiff to show:
(i) that [she or] he belongs to a racial minority; (ii) that [she or] he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her or] his qualifications, [she or] he was rejected; and (iv) that, after [her or] his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
*McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. The Court noted that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13.

While the record presented to the court might have been more detailed, the record is not barren of relevant information. Defense counsel did not provide a statistical breakdown of the composition of the venire and petit jury, but the failure to do so is not necessarily fatal. *See supra* note 7. In fact, the record makes clear that the prosecutor and defense counsel exhausted the entire venire, so that the trial court almost ran out of venire members.[14] Every one of the venire members who remained after challenges for cause was either placed on the jury or removed by peremptory strike. It is, therefore, possible to estimate the racial composition of the venire.[15] Even assuming that statistical information about the racial composition of the venire or jury is necessary, those numbers can be estimated.

The record reveals the race of the 19 venire members who were struck by peremptory challenges: 9 Blacks were struck by the prosecutor, 1 white was struck by the prosecutor, and 9 whites were struck by the defense, or a total of 9 Blacks and 10 whites were struck by peremptory challenges. The only other members of the venire, besides those struck for cause or those absent or late, were the 14 actual jurors (12–person jury plus two alternates). Therefore, there was a 33–person venire after the dismissals for cause (19 struck by peremptory challenges, plus 14 seated as the jury). If all 14 jury members were white, the venire had 24 whites and 9 Blacks, making it approximately 27.3 percent Black and 72.7 percent white. If all 14 jury members were Black, the venire had 23 Blacks and 10 whites, and was approximately 69.7 percent Black and 30.3 percent white.[16]

Therefore, the venire, after challenges for cause, was approximately 27 percent to 70 percent Black, but 90 percent of the prosecutor's strikes were directed at Black venire members.[17] In addition to these numbers, the prosecutor's explanations for her strikes were vague and mentioned the race of the venire members struck by defense counsel, the one white venire member struck by the prosecutor answered a question about drug use while most of the Black venire members struck by the prosecutor answered no voir dire questions, and the prosecutor exercised all of her peremptory challenges against the jury panel.[18]

**14.** When the attorneys finished choosing the jury, there were no eligible venire members left—only a juror whom the prosecutor had successfully moved to strike for cause earlier in the process remained.

**15.** In *Nelson, supra,* in contrast, the appellate court was unable to determine the relevant numbers (in that case, jury composition) from the record. *Nelson, supra,* 601 A.2d at 590. In addition, the fact that the court was running out of venire members in the instant case made it easier for counsel to predict which venire members would replace those removed by peremptory strikes, which would have made it easier to deliberately alter the racial composition of the jury. *See Little, supra,* 613 A.2d at 884 (under procedures used, it was not possible to predict which venire member would replace stricken juror); *cf. Eiland, supra* 92 Md.App. at 46 note 2, 607 A.2d at 62 (Md., court almost ran out of venire members, prosecutor used peremptory strikes to remove some jurors so he could place specific other venire members on the jury).

**16.** If the venire mirrored the District's population, it would have been approximately 70% black and 30% white, but it seems, after challenges for cause, likely to have had more whites than the general population. Bureau of the Census, Economic and Statistics Admin., U.S. Department of Commerce, State and Metropolitan Area Data Book 1991, at 208 (4th ed. 1991); *cf. Nelson, supra,* 601 A.2d at 591 n. 25.

**17.** *See Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1278–79 (and cases cited).

**18.** The strikes exercised by the defendant are relevant only in determining whether any non-group members remained in the pool when it became the prosecutor's turn to strike. *Cf. Nelson, supra,* 601 A.2d at 590. In the instant case, defense counsel and the prosecutor alternated strikes, and defense counsel continued to strike white jurors from the originally-seated panel long into the selection process, so that there is no tenable argument that defense counsel's strikes removed all of the whites from the jury box, leaving only Blacks for the prosecutor to strike. Seven of defense counsel's peremptory challenges were aimed at the fourteen-person panel which was seated in the jury box before peremptory challenges began. Therefore, since all of defense counsel's strikes were aimed at white jurors, there were at least seven whites in the jury box, from the very beginning of the peremptory strikes, who were available for the prosecutor to strike. The government may not

*See Little, supra,* 613 A.2d at 886 (prosecutor's "generalized statement of reasons ... may mask discriminatory motives and thus may contribute to ... a defendant's attempt to make a prima facie showing"); *id.* at 887 (prosecutor passed four times).

### III.

The charge that the government has discriminated under *Batson* is a "very serious" one, as the majority acknowledges. *See* majority opinion at 6. As the Supreme Court has pointed out, it implicates no less than public confidence in the justice system. *See Batson, supra,* 476 U.S. at 87, 106 S.Ct. at 1718. The government must be accorded an opportunity to make a full response to a *Batson* claim. *See Jones v. Ryan, supra* note 4, 987 F.2d at 972 ("prosecutor has the burden of providing 'a "clear and reasonably specific" explanation of his [or her] "legitimate reasons" for exercising the challenges' ") (quoting *Harrison v. Ryan,* 909 F.2d 84, 88 (3d Cir.), *cert. denied,* 498 U.S. 1003, 111 S.Ct. 568, 112 L.Ed.2d 574 (1990) (citing *Batson, supra,* 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20)). The defense, in turn, should be given an opportunity to respond to the prosecutor's statement of reasons.[19] From the record in the instant case, in my view, the court could conclude that appellant had presented a prima facie case on either of his *Batson* claims.[20] *Cf. Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1278–79 (citing cases). A limited remand would follow. *Id.* 542 A.2d at 1279–80. But, at least, on this record, the court should remand the case to the trial court to make findings of fact and a ruling on the defense challenges to the prosecutor's use of peremptory challenges. *See id.* 542 A.2d at 1277.

The seriousness of the charge made by defense counsel cannot be ignored by the court; too much is at stake. *See* majority opinion at 15 (*Batson* claim "demands the closest possible scrutiny by both the trial court and this court"). As pointed out, moreover, by the Third Circuit Court of Appeals:

> if tension exists between the "old tradition" of unconsidered preference for unfettered use of peremptory challenges and the still relatively "young tradition" of meaningful safeguards against invidi-

retaliate against racially-motivated defense strikes by making racially-motivated strikes of its own. The proper remedy for the government would be a reverse-*Batson* claim. *See Georgia v. McCollum,* — U.S. —, —, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992).

**19.** Several *Batson* cases indicate that the defendant must be given an opportunity to rebut the government's proffered reasons for its peremptory strikes. *See Gordon, supra,* 817 F.2d at 1541 (remanding, where trial court "failed to make any independent inquiry or allow [the defendant] the opportunity to offer rebuttal evidence pertaining to the Government's reasons," originally a *Swain* claim of past pattern of discrimination); *Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1272–73 (Md., interpreting *Batson* and Title VII cases: defendant must be given opportunity to rebut prosecutor's reasons); *id.* 542 A.2d at 1272 (because "the defendant has the ultimate burden of persuading the court there has been intentional racial discrimination[,] ... once the prosecutor has come forth with reasons to rebut the defendant's [prima facie] case, the defendant then 'must be afforded a fair opportunity to demonstrate that [the prosecutor's] assigned reason for [the peremptory challenge] was a pretext or discriminatory in

its application' ") (paraphrasing *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 807, 93 S.Ct. at 1826–27); *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 807, 93 S.Ct. at 1826–27 (Title VII disparate treatment case, petitioner must be given opportunity to rebut asserted reasons of employer); *Dawn, supra* note 5, 897 F.2d at 1448 (*Batson* claim, trial court must give defendant "reasonable opportunity" to develop record).

**20.** The record shows that appellant is Black, and, unlike *Stanley, supra* 313 Md. at 57 note 3, 542 A.2d at 1283, 1285, the prosecutor was given a full opportunity by the trial judge to respond to the defense claim that she was exercising her peremptory challenges in a racially discriminatory manner. The prosecutor's response to appellant's initial *Batson* objection occupies one paragraph of the transcript, and her response to appellant's second articulation of the *Batson* challenge appears in three paragraphs, constituting twenty lines of transcript. It is true, however, that the government was never expressly informed by the trial judge that appellant had presented a prima facie case which shifted the burden to the prosecutor to give neutral reasons for her peremptory challenges of Black venire members. *See Batson, supra,* 476 U.S. at 97–98, 106 S.Ct. at 1723–24.

ous application of racial stereotypes, then the latter consideration must prevail. If the former consideration still prevailed, the "price" would be the jeopardizing of the integrity of the judicial process and the stigmatization of venirepersons of color. And such a price would be "too high."

*Jones v. Ryan, supra* note 4, 987 F.2d at 968 (citing *Georgia v. McCollum, supra* —— U.S. at —— note 18, 112 S.Ct. at 2358, in turn, citing *Edmonson v. Leesville Concrete Co.,* —— U.S. ——, ——, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991)). Accordingly, I respectfully dissent.