**Marvin C. LITTLE, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 90–CF–608.**

District of Columbia Court of Appeals.

Argued June 23, 1992.
Decided Aug. 7, 1992.

Richard S. Greenlee, Public Defender Service, with whom James Klein and Elizabeth Taylor, Public Defender Service, Washington, D.C., were on the brief, for appellant.

J. Patrick Rowan, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas J. Tourish, Jr., and Clifford T. Keenan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN and WAGNER, Associate Judges, and KERN, Senior Judge.

FERREN, Associate Judge:

A jury convicted appellant of assault with intent to kill while armed, D.C.Code §§ 22-501, -3202 (1989 & 1991 Supp.), carrying a pistol without a license, *id.* at § 22-3204(a), and one count of possession of a firearm during a crime of violence, *id.* at § 22-3204(b).[1] Appellant argues that: (1) the trial court committed constitutional error when it permitted the government to introduce a hearsay statement, which tended to identify appellant as the gunman, in violation of his Sixth Amendment right to confrontation; (2) the trial court erred when it determined that appellant failed to establish a *Batson*[2] prima facie case of racial discrimination by the prosecutor's use of peremptory challenges; and (3) appellant's conviction for possession of a firearm during a crime of violence merged with his conviction for assault with intent to kill.

## I. Summary

Appellant's merger argument is foreclosed by this court's recent decision in *Thomas v. United States,* 602 A.2d 647 (1992). We therefore hold that appellant's conviction under D.C.Code § 22-3204(b) (possession of a firearm during a crime of violence) does not merge into a conviction under D.C.Code §§ 22-501, -3202 (assault with intent to kill while armed). Second, we conclude that the critical statement, "No, Marvin," uttered by a nontestifying witness immediately before appellant's alleged armed assault was not a hearsay statement. Accordingly, admission of this statement through the testimony of two other witnesses did not violate appellant's Sixth Amendment rights. Finally, we conclude that, although the trial court's *Batson* inquiry was not entirely satisfactory, the court did not err in finding that appellant failed to make out a prima facie case of discrimination in the prosecutor's use of peremptory challenges. We therefore affirm.

## II. The Hearsay Issue

### A.

The government presented evidence at trial that appellant shot a security guard, Jeffrey Richardson, in the stomach when Richardson attempted to disarm appellant, who was fighting another man later identified only as "Topcat." Appellant denied involvement in the shooting and presented three witnesses to support his alibi and misidentification defense.

Richardson testified that on August 13, 1989, he was on duty on the grounds of 1140 N. Capitol Street, N.W. when he saw two men fighting. Although he did not know either man at the time of the incident, he later identified appellant as one of them. Appellant had a pistol in his hand. In an attempt to break up the fight, Richardson drew his gun and ordered appellant to turn over the pistol. Rather than complying with the order, appellant pointed his gun at Richardson's face and pulled the trigger. The gun "clicked," giving Richardson an opportunity to knock it downward. As he did so, the gun discharged, and a bullet hit him in the abdomen. As he fell, Richardson discharged his own gun four times.[3] Just before appellant pointed his gun at Richardson, the other man, Top-

1. The jury acquitted appellant of assault with a dangerous weapon and a second count of possession of a firearm during a crime of violence.

2. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

3. A bystander was hit by a bullet in the thigh, accounting for the two charges for which the jury subsequently acquitted appellant. *See supra* note 1.

cat, was able to run away. According to Richardson's testimony, before Topcat ran away he said: "No, Marvin." Topcat did not testify at trial. Another witness, Shirleen Thompson, also testified that she heard Topcat say, "No, Marvin, No."

B.

Appellant moved pretrial to suppress the statements of Richardson and Thompson that they heard Topcat say, "No, Marvin," arguing that such testimony constituted hearsay identification of appellant which could not be admitted into evidence at trial unless the declarant, Topcat, testified. The trial court denied the motion, saying: "I think it's not hearsay and I think if it were, it almost certainly would qualify as an excited utterance of some kind, even if the other person is not available as a witness." We agree with the trial court that the statement was not hearsay.

Our holding is governed by the recent concurring opinion of Judge Wagner, joined by Judge Schwelb, in *Burgess v. United States,* 608 A.2d 733, 739 (D.C. 1992). In *Burgess,* the government's star witness testified that two men approached a car in which she and a companion were parked, and she heard her companion call one of the men "Tony" and the other "Leroy." *Id.,* 608 A.2d at 734. A few minutes later "Tony" pulled a gun, her companion walked away from the car, and she heard two gunshots. As she started to flee, her companion returned and attempted to get back into the car but fell and told her to leave. Her companion was later pronounced dead from a gunshot wound, and "Tony" was later identified as appellant Anthony Burgess. *Id.,* 608 A.2d at 734.

A majority of the division, per the concurring opinion, held, relying on the definition of "hearsay" and federal decisions interpreting and applying FED.R.EVID. 801, that "[t]he mere utterance of the name, "Tony," does not constitute hearsay." *Id.,* 608 A.2d at 739. Under the Federal Rules, "A statement is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." FED.R.EVID. 801(a). " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." *Id.* at R. 801(c).

> In determining what is an assertion, the crucial distinction under Rule 801 is between intentional and unintentional messages, regardless of whether they are express or implied. Statements which unintentionally impart a message are regarded as having an inherent trustworthiness which diminishes significantly any need for cross-examination to test the declarant's credibility. Where the declarant does not intend to assert a fact or communicate a belief, his or her truthfulness in making a comment is not considered to be an issue. Thus, an unintentional message is presumptively more reliable than an intentional one. Such evidence is not generally excludable under the hearsay rule, the primary purpose of which is to exclude declarations when their veracity cannot be tested through cross-examination.

*Burgess,* 608 A.2d at 740 (quotations and citations omitted).

In this case we conclude that the declarant's utterance of a first name ("Marvin") was no more than a noun addressing to whom the declarant was sending his message ("No") and that there is no evidence the declarant was intending to introduce or otherwise identify "Marvin" to anyone. *See id.,* 608 A.2d at 740 ("The word 'Tony' appears to have been no more than a salutation or the typical personal reference made in conversation."). "Under the circumstances, any message conveyed can be classified only as incidental and not intentional.... Therefore, the evidence falls outside of the hearsay rule as the declarant did not intend to make an assertion." *Id.* Because the testimony of Richardson and Thompson regarding what they heard Topcat say was not hearsay, appellant had no Sixth Amendment right to confront the declarant, Topcat. The jury, therefore, was free to consider the statement, "No, Marvin," as circumstantial evidence that the assailant's name might have been "Marvin." *See id.* at 741.

### III. The *Batson* Issue

#### A.

Immediately after the jury was selected, but before it was sworn, defense counsel moved for a mistrial, citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Counsel argued:

> As the Court I'm sure will note, Mr. Little, my client, is black, and the prosecutor, by my count, exercised ... seven strikes, six of them against black individuals, a number of whom answered no questions at all.
>
> I think at this point it is incumbent upon the government to give the Court neutral explanations for the exercise of its strikes.

The trial judge replied:

> [T]he fact is that on every panel of fifty-two prospective jurors, the vast majority in this city are and have been for many years and probably will be for many years to come, black people. So that when [the prosecutor] exercises p[er]emptory challenges against any juror, the odds are heavy that person he will be challenging will be black instead of white.
>
> Beyond that, I did not notice in any pattern of challenges anything that even remotely resembled a racial motivation in the exercise of p[er]emptory challenges.
>
> I believe one of his strikes was someone who was white. I think that probably satisfies any constitutional claim that could even be made in the wildest stretch of the imagination.
>
> Having said that, [Mr. Prosecutor], if you want to respond, now would be your opportunity.

The prosecutor then said:

> Your Honor, I don't think I need to respond. Again, if I am put on the spot of having to justify why the strikes I made, you know, were made in a neutral way, I would have to give it some thought.
>
> I mean, in looking at a prospective juror, you know, not necessarily the answers that one gives is what the attorney is looking for. One is looking for demeanor, one is looking for gait, one is looking for what the attorney thinks would be an individual who is going to give the case a fair shake.
>
> The strikes which I made were based upon a number of different factors, including the way a person conducted themselves or, you know, if questions were answered in a certain way.
>
> I would just note that I wasn't keeping track. I know that at least one of my very last strikes was of a white person, and I wasn't keeping track of who the other individuals—as individuals, you know, that were struck.

The judge responded: "I think that explanation is certainly satisfactory to me.... I don't want to do anything inadvertently that will leave a cloud over this record. But, from my perspective, that is about as far-fetched a claim as could possibly be made."

But defense counsel observed that:

> the composition of this jury panel contained a lot of white people, and a lot of white people came up, and the only one that was struck by the prosecutor was someone who responded to a question at the bench. It was someone who took a neutral stance, vis-a-vis allegations of police impropriety.
>
> The rest of the strikes were exercised against [black] people and I think ... the Court should be suspect in accepting things like "demeanor" and so forth [as explanations for strikes], because those are often used to disguise what could be improper motives.

The trial court, however, remained unconvinced and stated for the record that "out of fifty-two people [on the panel], there were not more than ten white people. I could be off one or two." The prosecutor noted that he had "passed" four times and had opted not to strike anyone, and that if he had a discriminatory motive he would have used those passes to strike additional black jurors in the hopes of seating additional white jurors.

After a lunch recess, the trial judge and counsel all noted that the jury which had been seated consisted of four whites and

eight blacks and that the two alternates were black. Defense counsel also made sure the record reflected that it was not possible to tell the race of the venire member who would enter the jury box next to replace a struck juror because there was no seating order and there had been no general roll call. The court then denied the motion and said:

> I think we have already spent substantially more time on this defense motion than the motion deserves in the context of this case. That's not to minimize the importance of the issue. It's critically important in appropriate cases where the motion would lie.
>
> This is, in my judgment, clearly not such a case. Except for the use of numbers, which can sometimes mask realities in ways that look superficially suspicious, which I don't think is the case here, there's no question in my mind that the exercise of p[er]emptory challenges by the prosecutor in this case was not in any way racially motivated.
>
> There were numerous rounds in which the prosecutor passed and didn't exercise any challenges at all, which clearly could have been utilized even without knowing who was going to replace the people, if Mr. [Prosecutor's] purpose was to exclude blacks from this jury, because there would have been at least a chance that that motive would be satisfied in that way.
>
> To me the motion is absolutely ridiculous on this record based on my observations, and I won't go into it further. I see no reason why Mr. [Prosecutor] has to explain anything at all further about why he challenged the people he did any more than I would require the defense to make any explanation on this record if the shoe were on the other foot.
>
> Motion closed.

B.

In *Batson v. Kentucky,* the Supreme Court held that the Equal Protection Clause forbids the government from using its peremptory challenges to strike potential jurors solely on account of their race "or on the assumption that black jurors as a group will be unable impartially to consider the [government's] case against a black defendant." 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). "Once the defendant makes a prima facie showing [of discrimination], the burden shifts to the [government] to come forward with a neutral explanation for [striking] black jurors." *Id.* at 97, 106 S.Ct. at 1723. In *Powers v. Ohio,* — U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court made explicit what was implicit in *Batson,* holding that a prosecutor's use of peremptory challenges "to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race" also violates the excluded jurors' rights under the Equal Protection Clause, *id.* — U.S. at ——, 111 S.Ct. at 1370, and that a criminal defendant has standing to raise the equal protection rights of an excluded juror, no matter the race of the defendant. *Id.* — U.S. at ——, 111 S.Ct. at 1370–74. *See also Georgia v. McCollum,* — U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (Criminal defendant's discriminatory exercise of peremptory challenge violates Equal Protection Clause); *Edmonson v. Leesville Concrete Co.,* — U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (private litigant's discriminatory exercise of peremptory challenge in civil case violates Equal Protection Clause).

This court has had only one previous occasion to consider the *Batson* issue, and in that case we rejected the appellant's argument as a threshold matter because he failed to create an adequate record of a prima facie showing that the prosecutor had discriminatorily used his peremptory challenges. *Nelson v. United States,* 601 A.2d 582, 590 (D.C.1991). We have no such problem in this case.

The question presented is whether the trial court erred in determining that appellant failed to make a prima facie showing requiring the government to put forth neutral, nondiscriminatory reasons for striking six black jurors. Appellant, relying on his equal protection rights as articulated in *Batson,* first showed "he is a member of a

cognizable racial group," and that the prosecutor "exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. Second, appellant was entitled to rely on the fact "that peremptory challenges constitute a selection practice that permits those to discriminate who are of a mind to discriminate." *Id.* (quotation omitted). The specific question we must answer, therefore, is the third *Batson* factor: whether the defendant showed that the above facts and "any other relevant circumstances raise[d] an inference that the prosecutor used that practice to exclude the venire[persons] from the petit jury on account of their race." *Id.*

The "other relevant circumstances" appellant relied on to make his prima facie showing were the following: (1) six of seven strikes were against blacks; (2) the prosecutor volunteered a statement that in general he strikes jurors based on factors such as "demeanor," "gait," and his perception about who would give the government a "fair shake," although he wasn't "keeping track" in this case; (3) the jury was composed of 8 black and 4 white venirepersons (the two alternates were black), a ratio more white than the venire; (4) the only white person struck by the prosecutor had answered a question, while some of the six black persons who were struck had not answered any question at all. In concluding that appellant failed to make a prima facie showing, the trial judge relied on the following: (1) one of the prosecutor's seven strikes was against a white person; (2) the prosecutor "passed" in four rounds; (3) the judge's other observations of the proceedings belied an inference of discrimination (including his observation of the prosecutor's actions and demeanor and his estimate that 42 members of the 52 person venire were black).

Whether a defendant has satisfied the burden of making a prima facie case is a question of law, namely, whether the voir dire record of the government's peremptory strikes, as shown by the defendant, raised "the necessary inference of purposeful discrimination." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. This court, however, must give deference to both the trial court's findings of fact and its ultimate ruling on whether the defendant satisfied the prima facie burden. *See id.* at 97, 106 S.Ct. at 1723 ("We have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.") But the trial court must "consider all relevant circumstances," including any pattern of strikes against black venire members and the prosecutor's questions and statements during the voir dire proceeding. *Id.* at 96–97, 106 S.Ct. at 1723.

This case is a close one. Although we sustain the trial court's ruling, we express concern about some of the court's statements and reasoning.

"As *Batson* itself makes clear, the proof of a prima facie case is necessarily fact-intensive." *United States v. Moore,* 895 F.2d 484, 485 (8th Cir.1990). To help explain the operation of the prima facie burden rule in *Batson* cases, the Supreme Court referred to its "disparate treatment" decisions under Title VII of the Civil Rights Act of 1964. *Batson,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18. Those decisions make clear that the burden of establishing a prima facie showing is not onerous and that its primary function is to eliminate the most common nondiscriminatory reasons for the prosecutor's peremptory strikes. *Cf. Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). "[T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 254, 101 S.Ct. at 1094 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978)).

Whether or not a defendant has made a prima facie showing is not strictly a numbers game. The exclusion of even one black member of the venire for racial reasons violates the equal protection clause.

*United States v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987); *United States v. Gordon,* 817 F.2d 1538, 1541 (11th Cir.1987), *vacated in part,* 836 F.2d 1312, *cert. dismissed,* 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988); *see People v. Jenkins,* 75 N.Y.2d 550, 555 N.Y.S.2d 10, 14–15, 554 N.E.2d 47, 51–52 (1990). Furthermore, numbers alone are not sufficient either to establish or negate a prima facie showing. *United States v. Dawn,* 897 F.2d 1444, 1448 (8th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990); *see United States v. David,* 803 F.2d 1567, 1571 (11th Cir.1986). Thus, the defendant is required to "come forward with *facts,* not just numbers alone" in making a prima facie showing, *Moore,* 895 F.2d at 485 (emphasis in original), although the trial court may examine statistical disparities as one factor in assessing the prima facie case. *See United States v. Alvarado,* 923 F.2d 253, 255 (2d Cir.1991); *United States v. Johnson,* 873 F.2d 1137, 1140 (8th Cir. 1989). Therefore, just as there can be no per se rule that "an inference of discrimination will *always* arise if, without more, there is a showing that the prosecution used all its peremptory challenges to exclude blacks," *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1521 (6th Cir. 1988) (emphasis in original), the mere presence of blacks on the jury in a ratio similar to that of blacks in the venire or community does not negate a defendant's prima facie case. *See Johnson,* 873 F.2d at 1139; *Jenkins,* 555 N.Y.S.2d at 14, 554 N.E.2d at 51.

Initially, defense counsel made what appeared to be an insufficient showing to meet appellant's prima facie burden. Counsel merely pointed out that appellant is black and that six of seven strikes were against blacks, "a number of whom answered no questions at all." The trial judge responded that he had not noticed any pattern of strikes and observed that, because the "vast majority" of the city's population (and hence venire) is black, chances are that when the government exercises its challenges it will strike black jurors.[4] That observation was in line with what this court recently said in *Nelson,* 601 A.2d at 590–91: Given the composition of the typical venire in the District of Columbia, "it is not particularly surprising [when] all of the persons struck by the prosecutor [are] black."

The trial judge also stated, however, that one of the prosecutor's strikes was against a white person and "that probably satisfies any constitutional claim that could even be made in the wildest stretch of the imagination." That assertion was erroneous as a matter of law, as indicated above, for the exclusion of even one black member of the venire for racial reasons violates the equal protection clause regardless of how many white jurors are struck. *Battle,* 836 F.2d at 1086; *Gordon,* 817 F.2d at 1541; *see Jenkins,* 555 N.Y.S.2d at 14–15, 554 N.E.2d at 51–52. A single strike of a white juror can be a means to conceal (or attempt to conceal) a pattern of striking black jurors, or it simply may be unrelated to other strikes used discriminatorily. Hence, the mere fact that the prosecutor has also struck a white juror (or jurors) does not necessarily—in the words of the trial judge—"satisfy any constitutional claim." Furthermore, the trial judge allowed the *Batson* inquiry to continue and asked the prosecutor if he wished to respond. At that point the prosecutor said he generally looked at things like "gait," "demeanor," or someone who would give the case "a fair shake," but that he had not "kept track" in this case. The judge then replied, "I think that explanation is certainly satisfactory to me." Although it is not entirely clear what the court meant, a generalized statement of reasons for peremptory strikes, such as the prosecutor made here, may mask discriminatory motives and thus may contribute to, and surely cannot serve to defeat, a defendant's attempt to make a prima facie showing.

4. The judge estimated for the record that 42 of the 52 venire persons were black. Based on the trial court's unchallenged estimate, the government in its brief calculated that 81% of the venire was black while the prosecutor exercised 86% of his strikes against blacks.

The court, moreover, allowed defense counsel to make additional arguments. Counsel pointed out that the only white member of the venire the prosecutor struck had answered a question, whereas "some" of the black members the prosecutor struck had not. When the parties returned after lunch recess, defense counsel had yet another opportunity to present his argument on the *Batson* motion, pointing to the eight-black/four-white composition of the jury selected.

We conclude, however, that, although defense counsel had ample opportunity to present a prima facie case, he ultimately failed to do so. While the trial court is obligated to "consider all relevant circumstances," *Batson,* 476 U.S. at 96–97, 106 S.Ct. at 1723, and we will assume the trial court has within its purview information relevant to the *Batson* inquiry, *see Sangineto-Miranda,* 859 F.2d at 1522, it is the defendant, not the judge, who must make the required showing. By attempting to make his showing in bits and pieces and by focusing primarily on numbers (six of seven venirepersons struck were black; only eight of twelve on the jury were black), appellant failed to meet his prima facie burden.

It is true the trial judge's statements that (1) the prosecutor's striking of a white member of the venire "probably satisfie[d] any constitutional claim," and (2) the prosecutor's general disclaimer regarding his use of peremptory strikes was "certainly satisfactory" were incorrect as a matter of law. But the judge also relied on his observations of the prosecutor's actions, including the fact that the prosecutor had "passed" four times. While a prosecutor's decision to pass and not use a peremptory challenge does not, standing alone, signal a mind that is free from discrimination, and thus does not necessarily defeat a prima facie case, *see Alvarado,* 923 F.2d at 256, the prosecutor here passed not once but four times. Looking at the record as a whole, therefore, we find no reversible error.[5]

In his briefs and in oral argument, appellant pointed to various additional factors which, when taken together, might indeed have made a prima facie case if so presented to the trial court. For example, four of the six black persons struck (not just "some," as defense counsel had argued before the trial court) did not answer any questions, and the two who did answered questions concerning their ties to law enforcement which presumably would favor the government. In *United States v. Johnson,* the United States Court of Appeals for the Eighth Circuit held that the voir dire record established an inference of discrimination because the government struck black venirepersons at a disproportionate rate "and struck blacks who did not respond during voir dire but did not strike whites who similarly did not respond." 873 F.2d at 1140. Furthermore, the jury list which sets forth the occupation, age, and place of residence of each juror showed that the six black members struck were "a heterogeneous group of both sexes with different occupations and social backgrounds and did not otherwise appear to be unsuited for jury service on this case." *Jenkins,* 555 N.Y.S.2d at 13, 554 N.E.2d at 50 (internal quotation omitted).

Such evidence, presented as a whole, might constitute "a 'pattern' of strikes against black jurors included in the particular venire [which] give[s] rise to an inference of discrimination," especially in light of "the prosecutor's ... statement[ ]," *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, that he "wasn't keeping track" of the reasons for his strikes. Although the trial court did not fully consider all of the above, neither did defense counsel make such a presentation to the trial court.

In closing, we caution trial judges to make a clear record of their reasons for finding or not finding that a defendant has made a prima facie case. The trial court should refer on the record to underlying facts or note the absence of facts either supporting or negating a prima facie case. *See, e.g., Moore,* 895 F.2d at 486. Where

5. We also note that the trial court, on several occasions, stated for the record that he understood the "critical importance" of the issues appellant raised in his *Batson* motion.

the issue is close, "*conservation of judicial* resources might well justify inquiry of the government attorney as to the reasons for making a strike," *Johnson,* 873 F.2d at 1140 n. 3, especially since the prosecutor's burden in rebutting a prima facie case is neither onerous nor time-consuming. *See Batson,* 476 U.S. at 97–98, 106 S.Ct. at 1723–24 (outlining burden shifting structure of *Batson* inquiry and stating that, although government must do more than profess "good faith," its explanation "need not rise to the level justifying exercise of a challenge for cause").

*Affirmed.*

KERN, Senior Judge, concurring:

While I agree with the affirmance of appellant's convictions and much of the reasoning in the majority opinion, I am not persuaded that the so-called *Batson* issue was a close one or that the trial court's *Batson* inquiry was not entirely satisfactory. I am persuaded that the trial court's analysis of the circumstances concerning the prosecutor's use of preemptory challenges here was quite adequate and that its decision that no *prima facie* case of discrimination was shown was quite correct. As the majority points out, appellant by "focusing primarily on numbers ... failed to meet his *prima facie* burden."