*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-0420

TRAVIS DELONTE HANEY, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-7680-16)

(Hon. José M. López, Trial Judge)

(Argued March 6, 2019                                    Decided April 25, 2019)

*Jennifer Williams*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Christopher R. Howland*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Lauren Bressack*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER, EASTERLY, and MCLEESE, *Associate Judges*.

FISHER, *Associate Judge*: Travis Delonte Haney appeals his convictions for various weapon-related offenses, arguing that the trial court erred in ruling that he had not established a prima facie case of discrimination in the government's

exercise of peremptory strikes. *See Batson v. Kentucky*, 476 U.S. 79 (1986). We reverse and remand for a new trial.

## I. Background and Procedural History

Following a jury trial from January 17 through January 23, 2017, appellant Haney was found guilty of Counts II through V: carrying a pistol without a license; possession of an unregistered firearm; unlawful possession of ammunition; and possession of a large capacity ammunition feeding device. Judge José M. López thereafter found appellant guilty of Count I, unlawful possession of a firearm by a person previously convicted of a crime of violence.[1] Appellant was sentenced to serve seventy-two months of incarceration and five years of supervised release, and to pay various assessments to the Victims of Violent Crime Compensation Fund. This appeal presents a claim of discrimination in jury selection based on race and gender as defense counsel objected that the government's peremptory strikes disproportionately excluded black jurors and black male jurors.

---

[1] At appellant's request the trial court severed Count I, and appellant waived his right to a jury trial on that count so the jury would not learn of his previous conviction. It appears that Judge López, in finding appellant guilty of Count I, relied on the jury's finding that he possessed the firearm.

At the beginning of jury selection the venire consisted of fifty-four potential jurors.[2] According to the trial transcript, the list of peremptory strikes, and a stipulation between the parties based on the trial attorneys' notes, twenty-five of the potential fifty-four jurors (or 46%) were black.[3] During this phase, the trial court asked potential jurors a list of questions, including an inquiry about any biases or strong feelings in favor of or against police. Responses tended to be racially divided – black jurors more frequently expressed distrust of the police while white jurors more frequently tended to believe that police testimony was trustworthy. After individual questioning fourteen jurors were stricken for cause, eight of whom were black. The parties then began to exercise peremptory strikes.

### A. Peremptory Strikes

After strikes for cause, forty jurors were qualified for jury service but only the first thirty-six jurors were needed. This group of thirty-six contained fourteen

---

[2] The roster listed fifty-six potential jurors, but after jurors were struck for cause, the last two jurors on the roster were not interviewed because the court thought they would not be needed to complete jury selection.

[3] There was some confusion between appellant and the government as to the precise number of jurors of each race in the initial venire. The Panel Summary Report provided by the Jurors' Office listed the race and gender of most jurors, but it appears that some jurors chose not to furnish that information.

black jurors (39%). The court instructed that the first fourteen jurors would fill the box, each party would exercise peremptory strikes two at a time until four strikes had been exercised, those stricken would be excused, and the empty seats in the jury box would be filled with jurors from the panel. Passes would be counted as strikes and parties could strike from the panel. Jurors were seated in the panel in the order in which they appeared on the Juror Panel Roster.

Each side was allotted ten peremptory strikes and one strike for selecting alternates. The government used its first three strikes to remove black females. Then the government used its next three strikes against black males in the panel. After these six strikes, defense counsel raised a *Batson* objection noting that every single person the government had stricken up to that point was black. The trial court suggested that the parties finish jury selection before it assessed whether there had been any patterns in the exercise of peremptory strikes. Defense counsel agreed. Subsequently, the government struck a white male from the panel for its seventh strike, a white female for its eighth strike, and a black male from the panel for its ninth strike. The government did not exercise its tenth strike or its extra strike for the alternates. Although defense counsel used seven of his peremptory strikes to exclude white jurors, at no point did the government raise a *Batson* challenge. *See Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (defendants are also

prohibited from engaging in purposeful discrimination in the exercise of peremptory challenges).

The jury was composed of two white females, two black females, four white males, two "other" race females, and two "other" race males.[4] At the conclusion of the government's peremptory strikes, defense counsel renewed his *Batson* objection as to black individuals and black men, pointing out that the government repeatedly went into the panel to strike black men, including a black male who had not answered any questions during voir dire. The government asserted that it was not required to give reasons for its strikes because defense counsel had failed to establish a discriminatory pattern. Defense counsel responded:

> This is what I would indicate, when it comes to a pattern, number one, black female; number two, black female; number three, black female; number four, black male; number five, black male; number six, black male; I then raised the *Batson* issue and at the moment I raised the *Batson* issue for the first time they struck two white individuals and then went back to striking a black male. So I think that when you have six black individuals in a row being struck, including going into a panel to strike black male I think that we have demonstrated a pattern, I mean it's six in a row. And it's going into the panel and it's black male, black male, black male. So, there are no black males on this jury right now. There's none. And they struck three black males in a row going into the

---

[4] One black female and one white male served as alternate jurors.

> panel to strike them. . . . I cannot think of a more clear pattern of striking black men and black individuals than when you have six in a row, and the only time that you start to strike a white person is after I raised this issue. I'm not really sure what more of a pattern there is, and at this point I think the Government should be required to explain racially neutral reasons for each of the strikes that they did for those first six strikes.

After hearing both parties, the trial judge concluded that there was not a pattern and ruled that it would "not sustain a *Batson* challenge."

## B. The Government Proffered Reasons For Its Strikes

The following day, the government told the trial judge that it "wholeheartedly agree[d]" with his ruling "that the defendant failed to make a prima faci[e] case showing the pattern of racially motivated strikes." However, the prosecutor believed it was "best to briefly develop the record for [the government's] racially neutral reasons for striking the jurors it struck so that the record on appeal is more fully developed" and stated that "defense would have the opportunity to respond, if and when, there is an appeal on this issue." The

government then gave explanations for eight of its nine strikes. It failed to give a reason for its fifth strike, a black male struck from the panel.[5]

Defense counsel then elaborated on the arguments he had made the previous day. He argued that "[j]ust one strike that is not racially neutral or is not neutral based upon constitutional protections . . . is sufficient for a *Batson* challenge" and "the fact that there is not a single black man on that jury is a clear indication of the fact that what happened during jury selection was not appropriate." Counsel also clarified that his reference the previous day to the government's for-cause strikes was to emphasize both the government's pattern of striking black jurors and the racially charged nature of the case. The government responded that because the court had already ruled that there was no prima facie case, it was not "at all appropriate for the defense to respond at [that] point" and a "defense response would be appropriate when there is an appeal."

The trial court was "satisfied that the reasons provided by the Government are not inherently discriminatory" and reiterated its ruling from the previous day denying appellant's *Batson* challenge. Appellant contends that the trial court erred

---

[5] Defense counsel pointed out that the government had not given an explanation for all black jurors who were stricken, but the trial court and government believed counsel was incorrect.

in finding that defense counsel did not establish a prima facie case showing discrimination against black jurors and black male jurors and seeks reversal.

## II.    Standard of Review

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges is prohibited.  *Batson*, 476 U.S. at 88 (race); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143-45 (1994) (gender); *see also (Edward) Robinson v. United States*, 890 A.2d 674, 680-81 (D.C. 2006) (recognizing the viability of a *Batson* claim when the exclusion of a potential juror is partially motivated by an impermissible consideration of both race and gender).   The Supreme Court has articulated a three-step process for analyzing *Batson* claims:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.  Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell ("Miller-El I")*, 537 U.S. 322, 328-29 (2003) (citing *Batson*, 476 U.S. at 96-98).  The ultimate burden of persuasion remains with the opponent of the strike. *Johnson v. California*, 545 U.S. 162, 170-71 (2005).

We review de novo the trial court's ruling on whether a party has made a prima facie case, which is a question of law. *(Edward) Robinson*, 890 A.2d at 683.

### III.  Analysis

### A. The Trial Court Erred in Finding that Appellant Had Not Presented a Prima Facie Case Under *Batson*

At the first stage of the *Batson* analysis, the party voicing the objection makes out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *(Edward) Robinson*, 890 A.2d at 682 (quoting *Johnson*, 545 U.S. at 168).  "The burden of establishing a prima facie showing is not onerous and is satisfied by significantly less than a preponderance of the evidence." *(Leon) Robinson v. United States*, 878 A.2d 1273, 1283 (D.C. 2005) (alterations and internal quotation marks and citations omitted).

> [A] prima facie case of discrimination may rest on a wide variety of evidence . . . including (though not limited to) the pattern of the prosecutor's strikes in light of the composition of the venire and the prosecutor's questions and statements during voir dire examination and in exercising his challenges. . . .  [I]t is pertinent to consider both any statistical disparities and discriminatory impacts

on the jurors, such as a disproportionate concentration of strikes against jurors of a particular race and/or gender, and any disparate treatment of jurors who are similar except for their race and/or gender. It is also pertinent to consider what, if any, information was elicited from and about the struck jurors by means of the voir dire and other preliminary inquiries. Other relevant circumstances may include the nature of the case and the race or gender of the defendant and other participants in the trial.

*(Edward) Robinson*, 890 A.2d at 683 (internal quotation marks and citations omitted).

Although we have said that "numbers alone are not sufficient [to either] establish or negate a prima facie showing," *Little v. United States*, 613 A.2d 880, 886 (D.C. 1992), focusing on those words in isolation can be misleading. Numbers can provide powerful circumstantial evidence of discriminatory intent. The point of *Little* was to emphasize that "proof of a prima facie case is necessarily fact-intensive." *Id.* at 885 (internal quotation marks omitted).

We have acknowledged that a prima face case can be established by a "wide variety of evidence," including unexplained statistical disparities of a certain magnitude. *(Leon) Robinson*, 878 A.2d at 1282-85 (citation omitted) (holding that the defendant established a prima facie case when, among other factors, the prosecution used six out of its ten peremptory strikes (or 60%) and eliminated all

six of the eligible black female jurors, who made up 16% of the venire); *see, e.g.*, *Johnson*, 545 U.S. at 164, 172-73 (black man charged with killing white child; prima facie case established when the prosecution used three out of its twelve peremptory strikes (25%) to eliminate all of the eligible black jurors, who made up 7% of the venire); *Miller-El I*, 537 U.S. at 342 (the prosecution used ten out of its fourteen peremptory strikes (71%) to eliminate 91% of the eligible black jurors resulting in one black person serving on the jury; "Happenstance is unlikely to produce this disparity."); *Capitol Hill Hosp. v. Baucom*, 697 A.2d 760, 760-61, 765 (D.C. 1997) (Ruiz, J., concurring) ("trial court erred in entirely discounting the statistical evidence"; defendants in a medical malpractice case established a prima facie case when the plaintiff used 100% of her peremptory strikes against white jurors, who made up 18% of the venire, resulting in an all-black jury); *id.* at 770 (Schwelb, J., concurring) ("To believe that the race of the jurors played no role whatever in jury selection in this case is to attribute to coincidence that for which there is a far more plausible explanation."; "Statistics such as those here presented . . . are something that the trier of fact is obligated to take into account."). *But see (Edward) Robinson*, 890 A.2d at 683-84 (government's strike against the only young black male juror where defendant was a young black male was insufficient to establish a prima face case; "[T]he numbers involved are too small to have statistical significance.").

In the case before us, the prosecutor used seven out of nine (or 78%) of her peremptory challenges to strike black jurors when the relevant qualified venire consisted of fourteen black jurors out of thirty-six (39%). She used four (or 44%) of her peremptory challenges to strike black males, who constituted only 18% of the venire; no black males served on the jury in a case where the defendant is a black male. The record thus reveals a "sizable statistical disparity and a discriminatory impact against black [jurors]." *See (Leon) Robinson*, 878 A.2d at 1285. Moreover, there seemed to be a pattern – the prosecutor's first six strikes were exercised against black jurors. Those facts, which raised "inferences that discrimination may have occurred[,] were sufficient to establish a prima facie case under *Batson*." *Johnson*, 545 U.S. at 173.[6]

We of course are not saying that purposeful discrimination occurred here. "The *Batson* framework is designed to produce actual answers to suspicions and

---

[6] Appellant argues that the trial judge should have considered two additional factors when considering whether he had articulated a prima facie case – the government's alleged pattern of moving to strike black jurors during the for-cause portion of voir dire and what he characterizes as the racially charged nature of the case (as revealed by the attitudes of various potential jurors toward police officers). Because we are persuaded that a prima facie case was established for the reasons explained above, we need not address, and express no views upon, these additional arguments.

inferences that discrimination may have infected the jury selection process." *Johnson*, 545 U.S. at 172. Eliciting and evaluating those answers is the function of stages two and three.

## B. The Trial Court Did Not Perform a Step Three *Batson* Analysis

At step two of the *Batson* analysis, "the prosecution must offer a race-neutral basis for striking the juror in question." *Miller-El I*, 537 U.S. at 328. Here, the prosecutor largely did so the following day, seemingly heeding our advice that "even when the trial court rejects a defendant's *Batson* challenge for lack of a prima facie showing, it still may be desirable for the prosecutor contemporaneously to memorialize and disclose the reasons for his or her strikes." *(Edward) Robinson*, 890 A.2d at 683; *see also (Leon) Robinson*, 878 A.2d at 1290 (explaining that the third step inquiry "might still be feasible . . . where the prosecutor voluntarily disclosed the reasons for his strikes in spite of the trial court's ruling and the record supports those reasons or otherwise allows them to be tested meaningfully"). Although the prosecutor neglected to explain why she struck one juror, the reasons she gave for her other strikes were race and gender neutral. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("Unless a discriminatory

intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.") (citation omitted).

Although defense counsel spoke at length after the prosecutor proffered reasons for her strikes, and the court thereafter rejected the challenge, appellant correctly asserts that the trial court did not proceed to the third step of *Batson.* The prosecutor twice insisted that defense counsel "would have the opportunity to respond [to the government's proffer], if and when, there is an appeal on this issue" and that it was inappropriate for defense counsel to respond after the court had already ruled on the *Batson* issue. The trial court did not invite defense counsel to respond despite these statements by the prosecutor, but simply announced that it was "satisfied that the reasons provided by the Government are not inherently discriminatory" and "we need to proceed with the trial."

At stage three of the *Batson* process, the defendant is required "to prove that the neutral reason offered is pretextual." *Miller-El v. Dretke ("Miller-El II")*, 545 U.S. 231, 267 (2005) (Breyer, J., concurring). "'[T]he trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.'" *Johnson v. United States*, 107

A.3d 1107, 1112 (D.C. 2015) (quoting *Snyder*, 552 U.S. at 477). On this record there is no evidence that the trial court "under[took] a sensitive inquiry into such circumstantial and direct evidence of [the government's] intent as may be available." *Smith v. United States*, 966 A.2d 367, 374 (D.C. 2009). And there is no suggestion that the trial court performed a "rigorous evaluation of the credibility of the prosecutor's explanations for [her] challenged peremptory strikes." *(Leon) Robinson*, 878 A.2d at 1289 (citation omitted).

In sum, the trial court repeatedly ruled that defense counsel had not made a prima facie showing in step one of *Batson*. At most, the trial court acknowledged that the prosecutor had satisfied her burden at step two by proffering non-race-based reasons for her strikes. But it is clear to us that the trial court never performed a step three evaluation or made an ultimate assessment about the legitimacy of the *Batson* challenge.

## C. Reversal is Necessary

The parties disagree as to how to proceed if we reach this juncture. Appellant asks us to reverse his convictions and grant him a new trial, while the government requests that we remand for the trial court to pick up where it left off –

to conduct its stage three analysis.  Reversal as opposed to remand is necessary when the government's reasons were proffered so long ago that they cannot be "tested meaningfully."  *(Leon) Robinson*, 878 A.2d at 1290.

"[A]s a reviewing court, we must evaluate the government's proffered reasons for striking jurors in light of the entire record on appeal and in light of matters of common knowledge."  *Smith*, 966 A.2d at 376.  One type of evidence to consider at *Batson*'s third step is a side-by-side comparison of black jurors in the venire who were struck and white jurors who were not struck, but allowed to serve on the jury.  *Miller-El II*, 545 U.S. at 241.[7]

---

[7]  Other examples of circumstances relevant to the stage three inquiry include:

> where (1) the prosecutor has misrepresented a juror's response . . . ; (2) the prosecutor failed to engage in any meaningful voir dire examination on a subject the prosecutor alleges it is concerned about; (3) a stricken juror is, aside from his race, strategically ideal for the state; (4) the defendant has presented a strong prima facie case, such as by pointing to the racially-charged nature of the prosecution; (5) there is a disparity in the difficulty of the questions that the prosecutor asked potential black jurors, as compared to white jurors; or (6) there is evidence that the prosecutor's office has a policy of systematically excluding blacks from juries.

*Smith*, 966 A.2d at 376 n.12 (alterations and internal quotation marks omitted).

Appellant presents a number of side-by-side comparisons, asserting that the prosecutor's facially neutral explanations for striking black jurors applied as well to white jurors who remained on the jury. Even if we concluded there was no merit to these comparisons, we do not see how a meaningful inquiry on remand would be practical with respect to two of the peremptory strikes.

Before we address that problem, however, we again note that the prosecutor failed to give the trial court an explanation for her fifth strike, exercised against a black male seated in the panel.[8] On appeal, the government provides a reason – the juror had an eight-year-old misdemeanor conviction. Sometimes there is reason to question "explanations the prosecutor may offer years later, for the first time and with the benefits of hindsight and preparation." *(Leon) Robinson*, 878 A.2d at 1289. The failure to proffer this explanation may simply have been an oversight, however, and there is contemporaneous evidence of the prospective

---

[8] There is nothing inherently suspect about striking into the panel. The prosecutor explained that she "struck into the panel when [she] was comfortable with the jurors that were in the box at the time." She was aware that the composition of the jury box might change as defense counsel exercised future strikes "and that other people who I liked less would be moving into those seats." Moreover, the trial judge had announced that a pass would be treated as a strike. The prosecutor therefore struck objectionable persons in the panel who were "closest to coming into the box." It appears, however, that four of the five jurors the prosecutor struck from the panel were black males; the fourth strike into the panel was against a white male.

juror's conviction, which was discovered during voir dire questioning.  On the other hand, appellant points out that the government urged the trial court to deny defense counsel's motion to strike for cause a white woman who served on the jury.  That juror had an eight-year-old DUI conviction (although that was not the basis for defense counsel's motion to strike).  If the prosecutor's fifth strike was our only concern, we might well decide to remand the case for the trial court to perform a stage three analysis with a side-by-side comparison of these similarly situated jurors.

However, at least two of the prosecutor's justifications were based on demeanor, such as a juror who made "more eye contact" with defense counsel and a juror who "looked bored throughout the day [and] was sleeping at certain points."  The trial court made no contemporaneous findings about the demeanor of these jurors and the record does not provide a basis for evaluating the accuracy of the reasons proffered by the government.  "As memories of the voir dire and jury selection fade, it becomes difficult (if not impossible) for the court and counsel to recreate in their minds the circumstances of each strike or even to remember individual jurors."  *(Leon) Robinson*, 878 A.2d at 1290 (internal quotation marks omitted).  Appellant's trial occurred over two years ago and the reasons for these specific strikes are not corroborated by contemporaneous evidence in the record.

"A *Batson* inquiry at this late date simply cannot replicate the probing inquiry to which appellant was entitled, and it is appellant who would be most prejudiced as a result." *Id*. at 1289. We therefore conclude that a new trial is required.

## IV. Conclusion

The trial court erred in ruling that appellant had not established a prima facie case under *Batson*. For the reasons discussed, we reverse appellant's conviction and grant him a new trial.

*It is so ordered.*