*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-1398

MARK BEASLEY, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-5953-15)

(Hon. José M. López, Trial Judge)

(Argued June 12, 2019                    Decided November 21, 2019)

*Claire Pavlovic*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Peter Smith*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman* and *Michelle Jackson*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Associate Judge* BECKWITH.

Concurring opinion but not as to the remedy by *Senior Judge* NEBEKER at

page 15.

BECKWITH, *Associate Judge*:    During jury selection at appellant Mark Beasley's criminal trial, the government used eight of its ten peremptory strikes against black jurors.  Mr. Beasley appeals his subsequent convictions, arguing that the trial court erred in determining that he failed to make out a prima facie case of discriminatory intent based on the government's use of peremptory strikes.  *See Batson v. Kentucky*, 476 U.S. 79 (1986).  We agree and therefore reverse Mr. Beasley's convictions.

## I.

Mr. Beasley was charged with murder, assault, and gun-related offenses stemming from an incident outside a nightclub.  At the start of trial, the court indicated that it would be using the "Arizona method" for picking jurors, meaning that, rather than implementing peremptory challenges round by round, each side would list all ten of its peremptory challenges[1] at once and then exchange lists. After the court reviewed each list, the parties would repeat the process for the four

---

[1] "In a trial for an offense punishable by imprisonment for more than one year, each side is entitled to ten peremptory challenges.  In all other criminal cases, each side is entitled to three peremptory challenges."  D.C. Code § 23-105(a) (2012 Repl.).

alternate seats.[2]

Individual questioning lasted three days and resulted in a venire of forty-eight qualified potential jurors. Sixteen of those potential jurors, or 33% of the venire, were black. When the parties began exercising peremptory challenges, the government used eight of its ten challenges to strike black jurors and used another challenge to strike a Latino juror.[3] After reviewing the strike sheets, defense counsel raised a challenge pursuant to *Batson v. Kentucky*, 476 U.S. at 89, in which the U.S. Supreme Court decided that in a criminal case, the use of a peremptory challenge to strike a prospective juror solely on the basis of race violated the Equal Protection Clause of the U.S. Constitution. The court completed the process for the alternate jurors[4] and then turned to Mr. Beasley's *Batson* challenge.

---

[2] Under D.C. Code § 23-105(b) (2012 Repl.), "[i]n addition to those otherwise allowed, each side is entitled to . . . two peremptory challenges if three or four alternate jurors are to be impaneled[.]"

[3] Mr. Beasley asserts that this was the only Latino juror in the venire, and neither the trial court nor the prosecutor disagreed when defense counsel stated that the government, in striking one Latino juror, had struck "100 percent of the Latinos."

[4] The government used its two alternate strikes on white jurors.

Mr. Beasley argued that the government used nine of its peremptory strikes "for people of suspect classifications, eight African American and one Latino." He asserted that "[e]ight African Americans based on my calculations is roughly 50 percent of the African Americans who are in the entire venire" and "100 percent of the Latinos." In response, the prosecutor acknowledged having struck eight black jurors, summarized the racial breakdown of Mr. Beasley's own peremptory strikes,[5] and noted that the defense struck two of the same black jurors: "So if you take away the very two that they struck, we struck . . . six black people, three white people, and one Latino individual." Defense counsel reiterated that the government "used 90 percent of their preemptory [sic] challenges to strike people of color" and argued, "I think that's all I need to do to establish a prima facie case regardless of whether I struck them or not." After hearing further arguments from both sides, the court asked the prosecutor how many black jurors it struck, "not including the ones that overlap." The prosecutor responded "six, excluding the two that overlap." The court then stated that Mr. Beasley had not established a prima facie case and that the court would not "pursue it any further." Mr. Beasley was subsequently convicted on all counts.

---

[5] Mr. Beasley struck seven white jurors and five black jurors.

## II.

On appeal, Mr. Beasley contends that the trial court erred in concluding that he had not established a prima facie case of discriminatory purpose under *Batson*. Relying primarily upon our recent decision in *Haney v. United States*, 206 A.3d 854 (D.C. 2019)—which concluded that a sizable statistical disparity in the government's use of peremptory strikes alone could establish a prima facie case of discrimination, *see id.* at 861—Mr. Beasley argues that the disparity here was more glaring than that in *Haney*. The government counters that numbers alone are not enough to satisfy the first step of *Batson*[6] and highlights what it views as *Haney*'s very different circumstances making it inapplicable to this case.

An attorney may not use peremptory challenges to engage in purposeful discrimination on the basis of race, gender, or both. *See Batson*, 476 U.S. at 88 (race); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143–44 (1994) (gender); (*Edward*) *Robinson v. United States*, 890 A.2d 674, 680–81 (D.C. 2006) (race and gender). The Supreme Court has devised a three-part framework for analyzing a

---

[6] We issued our decision in *Haney* after the government filed its brief in this case. Mr. Beasley discussed *Haney*'s application to this case in his reply brief, and the government addressed *Haney* at oral argument.

claim of discrimination in violation of *Batson* and its progeny. First, the defendant[7] has the burden to establish a prima facie case by showing that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005). If such a showing is made, the burden then shifts to the government to offer race-neutral bases for the strikes. *Id.* The trial court then "must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers v. Mississippi*, —— U.S. ——, 139 S. Ct. 2228, 2241, 204 L.Ed.2d 638 (2019). At step one—the facet of the *Batson* analysis at issue here—"the burden of establishing a prima facie showing is not onerous." *Little v. United States*, 613 A.2d 880, 885 (D.C. 1992). Whether a defendant has met that burden is a question of law that we review de novo.[8] *See Haney*, 206 A.3d at 860; *Little*, 613 A.2d at

---

[7] Though *Johnson* uses the term "defendant," the government may also challenge the defendant's use of peremptory strikes under *Batson*. *See Georgia v. McCollum*, 505 U.S. 42, 59 (1992).

[8] While Mr. Beasley and the government agree that our review is de novo, the government also suggests at one point that we must afford deference not only to the trial court's factual findings, but to its ultimate ruling on whether the prima facie showing was made. This contention, originating from *Little*, 613 A.2d at 885, and appearing in subsequent cases as well, s*ee Jefferson v. United States*, 631 A.2d 13, 17 (D.C. 1993), relies on the following language from *Batson*: "We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." 476

(continued…)

885.

*Haney* governs our decision here. Though the government relies upon our statement in *Little* that "numbers alone are not sufficient [to either] establish or negate a prima facie showing," 613 A.2d at 886, *Haney* cautioned that "focusing on those words in isolation can be misleading" and characterized *Little* as highlighting what a necessarily fact-intensive endeavor it is to make out a prima facie case, *see Haney*, 206 A.3d at 860–61. When viewed in context, "[n]umbers can provide powerful circumstantial evidence of discriminatory intent," *id.* at 861, and can reveal suspicious statistical disparities of a magnitude sufficient to establish a prima facie case. *See id.* (citing cases); *Tursio v. United States*, 634 A.2d 1205, 1210 (D.C. 1993) (concluding that statistics, including the percentage of strikes used and the composition of the venire, made the numbers "particularly significant" for the purposes of establishing a prima facie case); *see also Miller-El*

_____

(…continued)

U.S. at 97. This comment was not part of a statement or analysis of the standard of review, but conveyed the Supreme Court's trust in the trial courts' ability to figure out what circumstances beyond the "merely illustrative" examples offered by the Court itself might give rise to an inference of discrimination. *See id.* The Court did not suggest that these determinations were beyond the reach of the appellate court or subject to a type of deference antithetical to what our cases uniformly acknowledge is a legal inquiry subject to de novo review. *See, e.g.*, *Little*, 613 A.2d at 885; *Jefferson*, 631 A.2d at 17; (*Leon*) *Robinson*, 878 A.2d 1273, 1283 (D.C. 2005); *Haney*, 206 A.3d at 860.

*v. Cockrell* (*Miller-El I*), 537 U.S. 322, 342 (2003) ("In this case, the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors."); *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986) (citing *Batson* in support of its statement that "statistics showing discriminatory impact may in themselves constitute a showing of intentional discrimination").

In *Haney*, fourteen of the thirty-six people in the venire were black, and the government used seven of its nine[9] peremptory challenges to strike black jurors. 206 A.3d at 861. In other words, the government used 78% of its strikes against 39% of the venire. *Id.* In Mr. Beasley's case, the government used 80% of its peremptory strikes against black jurors, a group that comprised approximately 33% of the venire.[10] As in *Haney*, the record here therefore "reveals a 'sizable statistical disparity and a discriminatory impact against black [jurors]'" that should have prompted the trial court to acknowledge that a prima facie case was made and move on to the second *Batson* step. *Id.* (alterations in original) (quoting (*Leon*)

---

[9] "Each side was allotted ten peremptory strikes and one strike for selecting alternates," but the government elected to use only nine of its strikes. *Haney*, 206 A.3d at 858.

[10] The disparity becomes plainer still when considering the strike against the Latino juror: the government used 90% of its strikes against black and Latino individuals, a group that comprised approximately 35% of the venire.

*Robinson v. United States*, 878 A.2d 1273, 1285 (D.C. 2005)).

The government argues that the composition of the seated jury is an essential consideration in determining whether a defendant has established a prima facie case and that there is no evidence, for example, that Mr. Beasley was tried by a jury with no black members. We have taken note in some cases when certain classes of people have been totally excluded from a jury through the government's use of strikes. *See Haney*, 206 A.3d at 861 (noting no black males served on the jury); (*Leon*) *Robinson*, 878 A.2d at 1282–85 (listing as one factor that established the prima facie case that all six of the eligible black female jurors were eliminated). But we have never signaled that this factor was dispositive, and we have concluded even in the face of such evidence that no prima facie case was made. *See* (*Edward*) *Robinson*, 890 A.2d at 683–85 (holding that the government's strike against the only young black male juror, where the defendant was a young black male, was insufficient to establish a prima facie case). While the total exclusion of a class of people may be powerful evidence of discrimination, it is just one type of the "wide variety of evidence" that may establish a prima facie case.[11] *See id.* at

---

[11] That the trial court in *Haney* employed a different procedure for peremptory strikes also is not a compelling basis for distinguishing *Haney* from the present case. Although *Haney* stated that "there seemed to be a pattern" in that the government used its first six strikes against black jurors, 206 A.3d at 861, neither

(continued…)

683; *cf. Jefferson v. United States*, 631 A.2d 13, 20 (D.C. 1993) ("[I]f the defendant's *only* supporting contention is that the resulting jury was disproportionately composed, the defendant must show the composition of the venire *or* jury.") (emphasis added). In the end, excluding even one member of the venire on the basis of race would violate the Equal Protection Clause. *See Batson*, 476 U.S. at 86; *see also Flowers*, 139 S. Ct. at 2241 ("In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many."); *Tursio*, 634 A.2d at 1212 n.7 ("[R]ace is an impermissible factor, even if a minor one, in exercising peremptory strikes.").

Finally, the government conceded at oral argument that on this record, where the reasons for the government's and Mr. Beasley's strikes of the same two black jurors were not readily apparent, the overlap was not a valid basis for subtracting two jurors from the step-one analysis of the government's strikes. As stated in *Batson*, a defendant may establish a prima facie case "solely on evidence

---

(…continued)
the method used for exercising peremptory challenges in this case—exchanging lists of all ten strikes—nor the fact that the sole strike against a white juror was the fifth one listed makes the statistical disparity any less suspect than if the strikes had been exercised on an alternating basis. *See Miller-El I*, 537 U.S. at 342 ("Happenstance is unlikely to produce this disparity."). We did not suggest in *Haney* that the observation regarding the apparent pattern was essential to the conclusion that a prima facie case had been established.

concerning the *prosecutor's* exercise of peremptory challenges at the defendant's trial." 476 U.S. at 96 (emphasis added). The Supreme Court and other courts have frequently found the defense's use of strikes to be inconsequential to the first step of the *Batson* inquiry, where the focus is on the extent to which the prosecutor's actions permit an inference of discrimination. *See, e.g.*, *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 255 n.14 (2005) (stating that, though each side shuffled the jury more than once, "[the defendant's] shuffles are flatly irrelevant to the question whether prosecutors' shuffles revealed a desire to exclude blacks"); *Harrison v. Ricks*, 150 F. App'x 95, 97 (2d Cir. 2005) ("[T]he only circumstances that can ever be relevant when a trial court evaluates the strength of a defendant's prima facie case are circumstances that raise an inference of discrimination by the *prosecution*.") (emphasis in original). Though in their briefs both parties put forward reasons that this overlap of two strikes made it more likely or less likely that the government removed these two jurors for race-neutral reasons, it is impossible to know its import without inquiring further and evaluating the proffered explanations—an endeavor that is the function of subsequent steps of the *Batson* analysis, *see Haney*, 206 A.3d at 862.

Mr. Beasley provided evidence of a stark statistical disparity in the government's use of its peremptory strikes. The trial court erred in concluding this

evidence did not raise an inference of discrimination that was sufficient to establish a prima facie case under the *Batson* framework.

## III.

The government contends that, if we conclude that the trial court erred, we should remand and allow the trial court to pick up where it left off at step two of the *Batson* analysis. When faced with a step-one error, we must reverse rather than remand when the government's justifications for its strikes cannot be "tested meaningfully." (*Leon*) *Robinson*, 878 A.2d at 1290. This occurs when "no record was made of the prosecutor's justifications for his strikes," and "the written record contains nothing that would justify [them]." *Id.* at 1288–89. We have accordingly advised that "even when the trial court rejects a defendant's *Batson* challenge for lack of a prima facie showing, it still may be desirable for the prosecutor contemporaneously to memorialize and disclose the reasons for his or her strikes." (*Edward*) *Robinson*, 890 A.2d at 683. By doing so, the third-step inquiry "might still be feasible," (*Leon*) *Robinson*, 878 A.2d at 1290, whereas the cost of not proffering reasons on the record "may be the outright reversal on appeal of the defendant's conviction." (*Edward*) *Robinson*, 890 A.2d at 683.

In this case, the government did not make such a contemporaneous

disclosure, but argues on appeal that the "extensive" notes the prosecutors took during jury selection memorialized their reasons sufficiently enough to permit meaningful testing despite the long passage of time. Our recent decision in *Haney* is again instructive. The court there held that reversal, not remand, was necessary even when the government did proffer contemporaneous reasons for its strikes on the record. 206 A.3d at 862–64. It reached that conclusion for two reasons. First, the prosecutor failed to provide a justification for one of the jurors it struck. And second, at least two of the justifications the prosecutor offered related to a juror's demeanor, and no contemporaneous findings could provide a basis for evaluating the accuracy of these claims. *Id*. at 863–64.

In Mr. Beasley's case, the government made no contemporaneous proffers regarding its strikes of any of the jurors. And though the government now proffers information gleaned from the prosecutors' trial notes regarding its reasons, that information is not in the record before us.[12] The government further acknowledges that three of its strikes "lacked any obvious justification," suggesting that its

---

[12] The government presents this extra-record information in its brief—filed before our decision in *Haney*—to show that a remand would not be futile. But at oral argument it did not dispute that at least one of its proffered reasons was demeanor-based, with no contemporaneous record to support it, and one juror was missing from the proffer entirely. Thus, for the reasons discussed in *Haney*, reliance on this proffer would not obviate reversal. *See Haney*, 206 A.3d at 864.

reasons for these peremptory challenges were based on demeanor or other extra-record information. In the absence of contemporaneous evidence of these reasons, proceeding with the *Batson* inquiry at this point "simply cannot replicate the probing inquiry to which [Mr. Beasley] was entitled." (*Leon*) *Robinson*, 878 A.2d at 1289. Because more than two years have passed since Mr. Beasley's trial and there is no way to meaningfully test the government's justifications for using 80% of its strikes on 33% of the venire, reversal is required.

"In the problem of racial discrimination, statistics often tell much." *Tursio*, 634 A.2d at 1213. Despite a significant statistical disparity in the government's use of peremptory challenges, the trial court here precluded further inquiry into what motivated those strikes because, in its view, Mr. Beasley had failed to make a prima facie showing of discriminatory intent. Under our recent decision in *Haney*, this was error, and resumption of the *Batson* proceedings is not feasible. We therefore reverse Mr. Beasley's convictions and remand the case for further proceedings consistent with this opinion.[13]

---

[13] Mr. Beasley also asserts, and the government agrees, that Mr. Beasley's two PFCV convictions merge. Because we reverse all of his convictions due to the *Batson* error, we do not need to remand to vacate one of the PFCV convictions.

*So ordered.*

NEBEKER, *Senior Judge*, concurring in all but the remedy of reversal:  The precision with which the majority is now able to show by percentages of an appearance of high sin in the jury selection by the prosecutor was not presented to the trial judge.  That fact, no doubt, caused the trial judge to stop at the first step of our *Batson* analysis and to rule on the threshold issue of a prima facia showing of race-based strikes.  While these percentages may show a strong racial bias by the prosecutor, they do not create a conclusive presumption of such.  Here, the government makes what we must assume to be a good faith ability to dispel that showing.  Therefore, we should remand the case or the record for the trial judge to rule on the verity of these reasons for the strikes.  If the government fails to make that showing the trial court, not this court, should vacate the convictions and permit a new trial.

A conviction should not be reversed if an alternative exists to save it.  A

conviction of murder by a presumptively neutral jury[1] represents a substantial investment in public resources, and is always a case of great significance in our nation's capital. (As an aside, I observe that we may tend to treat murder as a mundane crime because they occur with such frequency in this jurisdiction.) Surely, a remand would be "just under the circumstances," *see* D.C. Code § 17–306 (2012 Repl.), to attempt a replication of what the majority must concede is a possibility here. The risk of reversal carries the risk that a murderer may go free after a neutral jury has convicted him. That is too serious a consequence to be dismissed, as the majority does, because two years have passed since trial. We should not treat this murder conviction with a flaw in the jury selection as an angler does when tossing a trout back because it is small. In my view all reasonable efforts to preserve the conviction should be exhausted before the draconian remedy of reversal is applied. Our duty demands that we remand, not reverse.

---

[1] We must assume that the jury selected was neutral because *Batson* is based on a jury selection error and does not question the ultimate neutrality of its members during trial absent any other reason advanced to question the petite jury's composition. *See Lockhart v. McCree*, 476 U.S. 162, 184 (1986) ("[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial . . . .") Appellant makes no arguments, and we see none, in which the trial itself contains reversible error.